## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

Case No.:  _____

GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY, and GEICO
CASUALTY CO.,

**Jury Trial Demand**

Plaintiffs,

-v-

ALBERT MATOS, M.D., PRIMERA HEALTH
CENTER INC., SUNIER L. RAMOS IZAGUIRRE,
MICHAEL ANTHONY CARRERAS, M.D.,
JOSEPH W. KING III, M.D., HEALTH CLINIC
REHABILITATION CENTER, INC., ODEY M.
VELAZQUEZ SOSA, TAMPA HEALTHCARE
THERAPY CENTER LLC, CLAUDIA B.
GONZALEZ-TORRES, JOHAN GARCIA DE
JESUS, ALLURE MED & WELLNESS SERVICES
LLC, YESENIA G. VALDEZ, BLUE SEA
REHABILITATION CENTER INC., and HANY
DE LA CARIDAD GARBEY MACHIN,

Defendants.
_____/

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co.,

GEICO General Insurance Company, and GEICO Casualty Co. (collectively,

"GEICO" or "Plaintiffs"), as and for their Complaint against Defendants Albert

Matos, M.D. ("Matos"), Primera Health Center Inc. ("Primera Health"), Sunier L.

Ramos Izaguirre ("Izaguirre"), Michael Anthony Carreras, M.D. ("Carreras"), Joseph

W. King III, M.D. ("King"), Health Clinic Rehabilitation Center, Inc. ("Health Clinic Rehab"), Odey M. Velazquez Sosa ("Sosa"), Tampa Healthcare Therapy Center LLC ("Tampa Healthcare"), Claudia B. Gonzalez-Torres ("Gonzalez-Torres"), Johan Garcia de Jesus ("Garcia de Jesus"), Allure Med & Wellness Services LLC ("Allure Med"), Yesenia G. Valdez ("Valdez"), Blue Sea Rehabilitation Center Inc. ("Blue Sea Rehab"), and Hany de la Caridad Garbey Machin ("Machin")(collectively, the "Defendants"), hereby allege as follows:

1.    This action seeks to recover more than $2,891,000.00 that the respective Defendants wrongfully obtained from GEICO by submitting thousands of fraudulent and unlawful no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants Primera Health, Health Clinic Rehab, Tampa Healthcare, Allure Med, and Blue Sea Rehab (collectively, the "Clinic Defendants") relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services and goods, including putative initial examinations, follow-up examinations, physical therapy, chiropractic, extracorporeal shockwave therapy ("ESWT") treatments, percutaneous electrical nerve stimulation ("PENS") treatments and implantable neurostimulator electrodes, home medical equipment ("HME"), and other related services and goods (collectively, the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims who were eligible for coverage under GEICO PIP insurance policies ("Insureds").

2.    Additionally, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending fraudulent and unlawful

PIP claims that the respective Defendants submitted through the Clinic Defendants, because of the fraudulent and unlawful activities described herein.

3. As set forth herein, the Defendants were never entitled to receive payment on the PIP insurance claims that they submitted to GEICO, because:

(i)    at all relevant times, the Defendants operated in violation of Florida law, including: (a) the licensing and operating requirements set forth in Florida's Health Care Clinic Act, Fla. Stat. §§ 400.990 et seq. (the "Clinic Act"); (b) Florida's False and Fraudulent Insurance Claims Statute, Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims Statute"); and (c) Florida's Physical Therapy Practice Act, Fla. Stat. §§ 486.011-486.172 (the "Physical Therapy Act"), thereby rendering the Defendants ineligible to collect PIP insurance benefits in the first instance, and rendering the Defendants' PIP insurance charges noncompensable and unenforceable;

(ii)   the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly received and were subjected to the Fraudulent Services;

(iii)  in many cases, the Fraudulent Services were never legitimately provided in the first instance;

(iv)   the Defendants' billing for the Fraudulent Services misrepresented and exaggerated the nature, extent, and results of the Fraudulent Services, in order to fraudulently and unlawfully inflate the charges submitted to GEICO;

(v)    the Defendants unlawfully billed GEICO for "physical therapy" services that were provided by massage therapists and unlicensed/unsupervised individuals; and

(vi)   the Defendants' billing for the Fraudulent Services misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services, and the billing was submitted in violation of the requirements set forth in Florida's Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

4.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO and other insurers through the Clinic Defendants.

5.      Each charge submitted by the Defendants through the respective Clinic Defendants since at least 2020 has been fraudulent and unlawful for the reasons set forth herein. The charts annexed hereto as Exhibits "1" - "5" set forth large and representative examples of the fraudulent and unlawful claims that have been identified to-date that the Defendants submitted to GEICO by mail through the respective Clinic Defendants.

6.      The Defendants' interrelated fraudulent and unlawful schemes began no later than 2020 and have continued uninterrupted since that time. As a result of the Defendants' schemes, GEICO has incurred damages of more than $2,891,000.00.

**PARTIES**

I.    **Plaintiffs**

7.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively, "GEICO" or "Plaintiffs") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and issue automobile insurance policies in Florida.

II.    **Defendants**

8.      Defendant Matos resides in and is a citizen of Florida. Matos was

licensed as an Area of Critical Need Medical Doctor in Florida on or about May 12, 2020. Matos falsely purported to perform or directly supervise many of the Fraudulent Services at each of the Clinic Defendants; falsely purported to serve as medical director at each of the Clinic Defendants; and used each of the Clinic Defendants as vehicles to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

9.      Defendant Primera Health is a Florida corporation with its principal place of business in Tampa, Florida, and was owned and controlled by Izaguirre. Primera Health was incorporated on or about September 30, 2019. As set forth herein, Matos and Izaguirre used Primera Health as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

10.     Defendant Izaguirre resides in and is a citizen of Florida. Izaguirre is not licensed to practice any health care profession in Florida. Izaguirre owned and controlled Primera Health, and used Primera Health as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

11.     Defendant Carreras resides in and is a citizen of Florida. Carreras was licensed to practice medicine in Florida on or about June 14, 2018. Upon information and belief, between January 2020 and February 2022, Carreras falsely purported to perform or directly supervise many of the Fraudulent Services at Primera Health; falsely purported to serve as medical director at Primera Health; and used Primera Health as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

12.     Defendant King resides in and is a citizen of Florida. King was licensed to practice medicine in Florida on or about April 21, 2010. Upon information and belief, between February 2022 and November 2022, King falsely purported to perform or directly supervise many of the Fraudulent Services at Primera Health; falsely purported to serve as medical director at Primera Health; and used Primera Health as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

13.     Defendant Health Clinic Rehab is a Florida corporation with its principal place of business in Tampa, Florida, and was owned and controlled by Sosa. Health Clinic Rehab was incorporated in Florida on or about July 20, 2022. As set forth herein, Matos and Sosa used Health Clinic Rehab as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

14.     Defendant Sosa resides in and is a citizen of Florida. Sosa is not licensed to practice any health care profession in Florida. Sosa owned and controlled Health Clinic Rehab, and used Health Clinic Rehab as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

15.     Defendant Tampa Healthcare is a Florida limited liability company with its principal place of business in Tampa, Florida, and was owned and controlled by Gonzalez-Torres and Garcia de Jesus and had Gonzalez-Torres and Garcia de Jesus as its members. Tampa Healthcare was organized in Florida on or about February 14, 2022. As set forth herein, Matos, Gonzalez-Torres, and Garcia de Jesus used Tampa Healthcare as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP

billing to GEICO and other insurers.

16.     Defendant Gonzalez-Torres resides in and is a citizen of Florida. Gonzelez-Torres is not licensed to practice any health care profession in Florida. Along with Garcia de Jesus, Gonzalez-Torres owned and controlled Tampa Healthcare, and used Tampa Healthcare as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

17.     Defendant Garcia de Jesus resides in and is a citizen of Florida. Garcia de Jesus is not licensed to practice any health care profession in Florida. Along with Gonzalez-Torres, Garcia de Jesus owned and controlled Tampa Healthcare, and used Tampa Healthcare as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

18.     Defendant Allure Med is a Florida limited liability company with its principal place of business in Tampa, Florida, and was owned and controlled by Valdez and had Valdez as its member. Allure Med was organized in Florida on or about January 13, 2023. As set forth herein, Matos and Valdez used Allure Med as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

19.     Defendant Valdez resides in and is a citizen of Florida. Valdez is not licensed to practice any health care profession in Florida. Valdez owned and controlled Allure Med, and used Allure Med as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

20.     Defendant Blue Sea Rehab is a Florida corporation with its principal

7

place of business in Tampa, Florida, and was owned and controlled by Machin. Blue Sea Rehab was incorporated in Florida on or about August 7, 2023. As set forth herein, Matos and Machin used Blue Sea Rehab as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

21.    Defendant Machin resides in and is a citizen of Florida. Machin is not licensed to practice any health care profession in Florida. Machin owned and controlled Blue Sea Rehab, and used Blue Sea Rehab as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

## JURISDICTION AND VENUE

22.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and the action is between citizens of different states.

23.    This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations (RICO) Act).

24.    Additionally, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

25.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is the District where one or more of the Defendants reside, and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

### I.   Overview of the Pertinent Laws Governing No-Fault Insurance Reimbursement

26.   Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is set forth in the No-Fault Law, which requires automobile insurers to provide personal injury protection benefits ("PIP Benefits") to insureds.

27.   Under the No-Fault Law, an insured can assign their right to PIP Benefits to health care services providers in exchange for those services. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company using the required claim forms – including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500" form) – in order to receive payment for medically necessary services.

28.   Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for "medically necessary" services. At the same time, a health care services provider, including a clinic licensed under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services.

29.   Pursuant to the No-Fault Law, "medically necessary" means:

[A] medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

>   (a)   In accordance with generally accepted standards of medical practice;

>   (b)   Clinically appropriate in terms of type, frequency, extent, site, and

duration; and

(c)    Not primarily for the convenience of the patient, physician, or other health care provider.

30.    PIP reimbursement for health care services is normally limited to $2,500.00 per insured. However, if a physician, physician assistant, advanced practice registered nurse, or dentist determines that an injured person suffered from an "emergency medical condition", health care providers can be reimbursed up to $10,000.00 per insured for health care services. Pursuant to the No-Fault Law, other types of health care practitioners – such as chiropractors – may not issue "emergency medical condition" diagnoses to patients so as to increase the potential PIP reimbursement from $2,500.00 to $10,000.00 per insured.

31.    Pursuant to the No-Fault Law, an "emergency medical condition" means: "a medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following: (a) [s]erious jeopardy to patient health[;] (b) [s]erious impairment to bodily functions[; and/or] (c) [s]erious dysfunction of any bodily organ or part."

32.    In order for a health care service to be eligible for PIP reimbursement, it not only must be medically necessary, but also must be "lawfully" provided.

33.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or

treatment."

34.     Thus, health care services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

35.     Pursuant to the Clinic Act, and subject to certain limited exceptions that are not applicable in this case, a license issued by the Florida Agency for Health Care Administration (the "AHCA") is required in order to operate a clinic in Florida. The Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider."

36.     Pursuant to the Clinic Act, health care clinics must – among other things – appoint a licensed physician as medical director who must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful," and take immediate corrective action upon discovery of a fraudulent or unlawful charge. Additionally, a clinic medical director must "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided."

37.     Further, pursuant to the Clinic Act, a clinic medical director must "[s]erve as the clinic records owner as defined in [Fla. Stat. §] 456.057." Pursuant to Fla. Stat. § 456.057(10), "[a]ll records owners shall develop and implement policies,

11

standards, and procedures to protect the confidentiality and security of the medical record," and all "[e]mployees of records owners shall be trained in these policies, standards, and procedures."

38. Pursuant to the Clinic Act, no health care clinic in Florida may operate without the day-to-day supervision of a legitimate physician-medical director.

39. Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed . . . but that is not so licensed, or that is otherwise operating in violation of this part . . . is an unlawful charge" and is ineligible for payment. Moreover, "[a] person who knowingly makes . . . an unlawful charge commits theft within the meaning of, and [which is] punishable as provided in, [Fla. Stat. §] 812.014."

40. Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

41. Under the False and Fraudulent Insurance Claims Statute, it is unlawful for a health care provider to engage in the general business practice of waiving – or failing to make a good-faith effort to collect – co-payments or deductibles from patients with PIP insurance.

42. Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

43.     Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics operating pursuant to the Clinic Act, to collect PIP Benefits for massage therapy or for services performed by massage therapists, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting."

44.     However, the No-Fault Law was amended, effective January 1, 2013, to prohibit reimbursement for massage or for services rendered by massage therapists, regardless of any other kinds of health care licenses the massage therapists may have, and regardless of whether the massage therapists work under the supervision of other licensed health care practitioners.

45.     Pursuant to the Physical Therapy Act, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy.

46.     The Physical Therapy Act also prohibits unlicensed individuals from practicing physical therapy. While the Physical Therapy Act does provide an exception to this rule, which permits a physical therapist to delegate certain patient care activities to an unlicensed assistant, this exception only applies if the unlicensed assistant works under the direct supervision of a physical therapist.

47.     Health care practices operating in Florida may not collect PIP Benefits for: (i) massage; (ii) any services performed by massage therapists; or (iii) physical

therapy services that are performed by unlicensed individuals without direct supervision by a licensed physical therapist. Thus, any such charges submitted by a health care provider are unlawful and noncompensable.

48. Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i) for any service or treatment that is "upcoded", meaning that the service or treatment is billed using a billing code that would result in payment greater in amount than would be paid by using a billing code that accurately describes the services or treatments performed;

(ii) to any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iii) with respect to a bill or statement that does not substantially meet the billing requirements as set forth in the No-Fault Law.

49. The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare and Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes that are used to bill for health care services.

50. In turn, the instructions promulgated by CMS for the completion of HCFA-1500 forms require – among other things – that all HCFA-1500 forms set forth – in Box 31 – the identity of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

51. To "directly supervise" a service, a supervising health care practitioner

14

"must be present in the office suite and [be] immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed."

52.     Additionally, pursuant to the No-Fault Law, in order for a health care service to be eligible for PIP reimbursement, the applicable HCFA-1500 claim form must set forth the professional license number of the provider who personally performed or directly supervised the underlying health care service, in the line or space provided for "Signature of Physician or Supplier, Including Degrees or Credentials".

53.     Insurers are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identity of the individual health care practitioners who performed or directly supervised the underlying services.

## II.     The Defendants' Fraudulent and Unlawful Schemes

54.     Since at least 2020 and continuing through the present day, the Defendants conceived and implemented interrelated fraudulent schemes in which they billed GEICO millions of dollars for unlawful, medically unnecessary, illusory, and otherwise non-reimbursable services.

55.     In the claims identified in Exhibits "1" - "5", almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as the result of the relatively minor automobile accidents they experienced that would necessitate the treatments that the Defendants purported to provide.

56.     Even so, in the claims identified in Exhibits "1" - "5", the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined, fraudulent protocols designed to maximize the billing that the Defendants could submit to insurers – including GEICO – rather than to provide medically necessary treatment to the Insureds who purportedly received and were subjected to this "treatment".

57.     The Defendants provided their pre-determined and fraudulent treatment protocols to the Insureds in the claims identified in Exhibits "1" - "5" without regard for the Insureds' individual symptoms or presentation – or, in most cases, the total absence of any significant continuing medical problems arising from any actual automobile accidents.

58.     Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, thereby permitting the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

59.     No legitimate physician, clinic, or other health care provider would permit the fraudulent treatment and billing protocols described herein to proceed under their auspices.

60.     The Defendants permitted the fraudulent treatment and billing protocols described herein to proceed under their auspices because: (i) the Clinic Defendants were, at all relevant times, operating in violation of the Clinic Act, without legitimate oversight and without medical directors who legitimately fulfilled their statutory duties

as medical directors; and (ii) the Defendants sought to profit from the fraudulent and unlawful billing that they submitted to GEICO and other insurers through the respective Clinic Defendants.

## A. The Unlawful Operation of the Clinic Defendants in Violation of the Clinic Act

61.     As part of the Defendants' fraudulent and unlawful schemes, the respective Defendants operated the Clinic Defendants in violation of the Clinic Act and Florida law.

62.     Because each of the Clinic Defendants was a health care clinic subject to the Clinic Act: (i) Izaguirre could not lawfully operate Primera Health; (ii) Sosa could not lawfully operate Health Clinic Rehab; (iii) Gonzalez-Torres and Garcia de Jesus could not lawfully operate Tampa Healthcare; (iv) Valdez could not lawfully operate Allure Med; and (v) Machin could not lawfully operate Blue Sea Rehab, unless each of the Clinic Defendants employed a licensed physician as their medical director, who actually performed the required duties of clinic medical directors.

63.     However, if Izaguirre, Sosa, Gonzalez-Torres, Garcia de Jesus, Valdez, and Machin (collectively, the "Clinic Owners") recruited legitimate physicians to serve as the legitimate medical directors of each of the respective Clinic Defendants, the physicians would be obligated to fulfill the statutory requirements applicable to clinic medical directors. By extension, any such legitimate medical directors would impede the Clinic Owners from using the respective Clinic Defendants as vehicles to submit large amounts of fraudulent and unlawful PIP billing to GEICO and other Florida

17

automobile insurers.

64.     Accordingly, the Clinic Owners each required a physician willing to falsely pose as the "medical director" at the respective Clinic Defendants, but who – in actuality – would not fulfill the statutory requirements applicable to clinic medical directors, and thereby permit each of the Clinic Owners to use the respective Clinic Defendants as vehicles to submit large amounts of fraudulent and unlawful PIP billing to GEICO and other insurers.

65.     Therefore:

(i)     Izaguirre retained Carreras, King, and Matos, all licensed physicians, who – in exchange for compensation – were willing to falsely pose as the legitimate medical directors of Primera Health.

(ii)    Sosa retained Matos, a licensed physician, who – in exchange for compensation – was willing to falsely pose as the legitimate medical director of Health Clinic Rehab.

(iii)   Gonzalez-Torres and Garcia de Jesus retained Matos, a licensed physician, who – in exchange for compensation – was willing to falsely pose as the legitimate medical director of Tampa Healthcare.

(iv)    Valdez retained Matos, a licensed physician, who – in exchange for compensation – was willing to falsely pose as the legitimate medical director of Allure Med.

(v)     Machin retained Matos, a licensed physician, who – in exchange for compensation – was willing to falsely pose as the legitimate medical director of Blue Sea Rehab.

66.     In order to circumvent Florida law and induce the AHCA to maintain the licensure of each of the respective Clinic Defendants, the Clinic Owners each entered into secret, individual agreements with Matos, and Izaguirre entered into secret, individual agreements with Carreras and King.

67.     In exchange for compensation from Izaguirre and Primera Health, Carreras, King, and Matos agreed to falsely represent, and did in fact falsely represent – to the AHCA; to the insureds who sought treatment at Primera Health; and to the insurers, including GEICO, that received PIP claims from Primera Health – that they were the true medical directors at Primera Health, and that they truly fulfilled the statutory requirements applicable to clinic medical directors.

68.     In exchange for compensation from Sosa and Health Clinic Rehab, Matos agreed to falsely represent, and did in fact falsely represent – to the AHCA; to the insureds who sought treatment at Health Clinic Rehab; and to the insurers, including GEICO, that received PIP claims from Health Clinic Rehab – that he was the true medical director at Health Clinic Rehab, and that he truly fulfilled the statutory requirements applicable to clinic medical directors.

69.     In exchange for compensation from Gonzalez-Torres, Garcia de Jesus, and Tampa Healthcare, Matos agreed to falsely represent, and did in fact falsely represent – to the AHCA; to the insureds who sought treatment at Tampa Healthcare; and to the insurers, including GEICO, that received PIP claims from Tampa Healthcare – that he was the true medical director at Tampa Healthcare, and that he truly fulfilled the statutory requirements applicable to clinic medical directors.

70.     In exchange for compensation from Valdez and Allure Med, Matos agreed to falsely represent, and did in fact falsely represent – to the AHCA; to the insureds who sought treatment at Allure Med; and to the insurers, including GEICO, that received PIP claims from Allure Med – that he was the true medical director at

19

Allure Med, and that he truly fulfilled the statutory requirements applicable to clinic medical directors.

71.     In exchange for compensation from Machin and Blue Sea Rehab, Matos agreed to falsely represent, and did in fact falsely represent – to the AHCA; to the insureds who sought treatment at Blue Sea Rehab; and to the insurers, including GEICO, that received PIP claims from Blue Sea Rehab – that he was the true medical director at Blue Sea Rehab, and that he truly fulfilled the statutory requirements applicable to clinic medical directors.

72.     However, Matos never legitimately served as medical director at any of the Clinic Defendants, and neither Carreras nor King legitimately served as medical directors at Primera Health.

73.     Instead, from the beginning of Matos's associations with the respective Clinic Defendants as the purported "medical director" of each of those clinics, and from the beginning of Carreras and King's associations with Primera Health as the purported "medical directors" at Primera Health: (i) Carreras, King, and Matos ceded true decision-making authority regarding health care services at Primera Health – and the resulting billing – to Izaguirre; (ii) Matos ceded true decision-making authority regarding health care services at Health Clinic Rehab – and the resulting billing – to Sosa; (iii) Matos ceded true decision-making authority regarding health care services at Tampa Healthcare – and the resulting billing – to Gonzalez-Torres and Garcia de Jesus; (iv) Matos ceded true decision-making authority regarding health care services at Allure Med – and the resulting billing – to Valdez; and (v) Matos ceded true

20

decision-making authority regarding health care services at Blue Sea Rehab – and the resulting billing – to Machin.

74. Matos never legitimately served as medical director at any of the Clinic Defendants, inasmuch as he: (i) never conducted systematic reviews of any of the Clinic Defendants' billings to ensure that the billings were not fraudulent or unlawful; (ii) never ensured that all treating practitioners at any of the Clinic Defendants were properly licensed; and (iii) never even made any attempt to discover the fraudulent and unlawful charges submitted through each of the Clinic Defendants – much less take any corrective action – and instead permitted each of the Clinic Defendants to operate in the fraudulent and unlawful manner as set forth herein.

75. Additionally, neither Carreras nor King legitimately served as medical directors at Primera Health, inasmuch as they: (i) never conducted systematic reviews of Primera Health's billings to ensure that the billings were not fraudulent or unlawful; (ii) never ensured that all treating practitioners at Primera Health were properly licensed; and (iii) never even made any attempt to discover the fraudulent and unlawful charges submitted through Primera Health – much less take any corrective action – and instead permitted Primera Health to operate in the fraudulent and unlawful manner as set forth herein.

76. What is more, though no Florida health care clinic may operate without the day-to-day supervision of a physician-medical director, Matos never provided legitimate, day-to-day supervision at the respective Clinic Defendants, and neither Carreras nor King provided legitimate, day-to-day supervision at Primera Health.

77.     For example, Matos was only present at each of the respective Clinic Defendants on an occasional basis, and Carreras and King were only present at Primera Health on an occasional basis.

78.     Furthermore, Matos never: (i) developed and implemented policies, standards, and procedures to protect the confidentiality and security of the medical records at any of the respective Clinic Defendants; nor (ii) trained the employees of any of the respective Clinic Defendants in any such policies, standards, and procedures, which are among the required statutory duties of clinic medical directors.

79.     Additionally, Carreras and King never: (i) developed and implemented policies, standards, and procedures to protect the confidentiality and security of the medical records at Primera Health; nor (ii) trained Primera Health's employees in any such policies, standards, and procedures, which are among the required statutory duties of clinic medical directors.

80.     Had Matos legitimately served as medical director at any of the respective Clinic Defendants, he would have noted, among other things, that each of the Clinic Defendants – as set forth herein – was operating in violation of Florida law, including the Clinic Act, the False and Fraudulent Insurance Claims Statute, the Physical Therapy Act, and the No-Fault Law.

81.     Additionally, had Carreras or King legitimately served as medical directors at Primera Health, they would have noted, among other things, that Primera Health – as set forth herein – was operating in violation of Florida law, including the Clinic Act, the False and Fraudulent Insurance Claims Statute, the Physical Therapy

22

Act, and the No-Fault Law.

82.     In fact, true authority over the provision of health care services at each of the Clinic Defendants and the resulting billing submitted through each of the Clinic Defendants – including the authority that would, at a legitimate clinic, be vested in the medical director – was held at all times by the respective Clinic Owners.

83.     Matos unlawfully permitted the respective Clinic Owners to dictate the manner in which insureds would be treated at each of the Clinic Defendants, and to dictate the manner in which health care services at each of the Clinic Defendants would be billed to GEICO and other insurers, because Matos wanted to continue profiting through the Clinic Defendants' fraudulent and unlawful billing.

84.     Additionally, Carreras and King unlawfully permitted Izaguirre to dictate the manner in which insureds would be treated at Primera Health, and to dictate the manner in which health care services at Primera Health would be billed to GEICO and other insurers, because both Carreras and King wanted to continue profiting through Primera Health's fraudulent and unlawful billing.

85.     Each of the Clinic Owners used the façade of Matos's respective "appointments" as the purported "medical director" at the respective Clinic Defendants to do what they were forbidden from doing, and Izaguirre used the façade of Carreras and King's respective "appointments" as the purported "medical directors" at Primera Health to do what he was forbidden from doing – namely: (i) operate individual health care clinics without a legitimate medical director at each of the clinics; (ii) engage in unlicensed medical decision-making with respect to the insureds

23

who sought treatment at the respective Clinic Defendants; and (iii) use the respective Clinic Defendants as vehicles to submit large amounts of fraudulent and unlawful PIP billing to GEICO and other insurers.

**B.     The Fraudulent and Unlawful Charges for Initial Examinations at Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab**

86.     As part of their fraudulent treatment and billing protocols, Matos, Primera Health, Izaguirre, Carreras, King, Health Clinic Rehab, Sosa, Tampa Healthcare, Gonzalez-Torres, Garcia de Jesus, Blue Sea Rehab, and Machin (collectively, the "Examination Defendants") purported to provide many of the Insureds in the claims identified in Exhibits "1" - "3" and "5" with an initial examination.

87.     As set forth in Exhibit "1", Matos, Primera Health, Izaguirre, Carreras, and King billed the initial examinations through Primera Health to GEICO under CPT code 99203, typically resulting in a charge of $236.66 for each initial examination they purported to provide.

88.     As set forth in Exhibit "2", Matos, Health Clinic Rehab, and Sosa billed the initial examinations through Health Clinic Rehab to GEICO under CPT code 99204, typically resulting in a charge of $338.16 for each initial examination they purported to provide.

89.     As set forth in Exhibit "3", Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed the initial examinations through Tampa Healthcare to GEICO under CPT code 99204, typically resulting in a charge of $365.06 for each

initial examination they purported to provide.

90.     As set forth in Exhibit "5", Matos, Blue Sea Rehab, and Machin billed the initial examinations through Blue Sea Rehab to GEICO under CPT code 99203, typically resulting in a charge of $225.62 for each initial examination they purported to provide.

91.     In the claims for initial examinations identified in Exhibits "1" - "3" and "5", the charges for initial examinations were fraudulent in that they misrepresented the Examination Defendants' eligibility to collect PIP Benefits in the first instance.

92.     In fact, and as set forth herein, the Examination Defendants were never eligible to collect PIP Benefits, inasmuch as Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab operated in violation of Florida law.

93.     Moreover, and as set forth herein, the charges for initial examinations identified in Exhibits "1" - "3" and "5" were also fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

1.     **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

94.     As set forth herein, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of CPT codes.

95.     The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

96.     Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an

initial patient examination typically represents that the patient presented for the examination with problems of moderate severity.

97.     The CPT Assistant provides various clinical examples of moderate severity presenting problems that would support the use of CPT code 99203 to bill for an initial patient examination, including:

(i)     Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)    Initial office evaluation of a 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)   Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of a 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

98.     Accordingly, pursuant to the CPT Assistant, the moderate severity presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

99.     Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination typically represents that an insured presented for the examination with problems of moderate to high severity.

100.    The CPT Assistant provides the following clinical examples of moderate

to high severity presenting problems that would support the use of CPT code 99204 to bill for an initial patient examination, including:

   (i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

   (ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

   (iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

   (iv)   Initial office visit for a 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

   (v)    Initial office visit for a 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

   (vi)   Initial office evaluation of a 70-year-old female with polyarthralgia. (Rheumatology)

   (vii)  Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

101. Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

102. By contrast, to the extent that the Insureds in the claims identified in Exhibits "1" - "3" and "5" had any presenting problems at all as the result of their typically minor automobile accidents, the problems almost always were minimal severity soft tissue injuries such as sprains and strains.

103. For instance, and in keeping with the fact that the Insureds in the claims

identified in Exhibits "1" - "3" and "5" either had no presenting problems at all as the result of their minor automobile accidents, or else had problems of minimal severity, in many of the claims identified in Exhibits "1" - "3" and "5", the Insureds did not seek treatment at any hospital as the result of their accidents.

104.    To the limited extent that the Insureds in the claims identified in Exhibits "1" - "3" and "5" did seek treatment at a hospital following their accidents, they almost always were briefly observed on an outpatient basis, and were discharged with nothing more serious than a minor soft tissue injury diagnosis such as a sprain or strain.

105.    Furthermore, in many of the claims identified in Exhibits "1" - "3" and "5", the contemporaneous police reports indicate that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in their accidents, or injured at all.

106.    Even so, in the claims for initial examinations identified in Exhibits "1" - "3" and "5", the Examination Defendants routinely billed for their putative initial examinations using CPT codes 99203 and 99204, and thereby falsely represented that the Insureds presented with problems of moderate severity and moderate to high severity, respectively.

107.    For example:

(i)      On August 7, 2021, an insured named JM was involved in an automobile accident. The contemporaneous police report indicated that JM was not injured and that JM did not complain of any pain at the scene. In keeping with the fact that JM was not seriously injured, JM did not visit any hospital emergency room following the accident. To the extent that JM experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial

examination of JM at Primera Health on August 16, 2021, Primera Health, Izaguirre, and Carreras billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved problems of moderate severity.

(ii)     On February 22, 2022, an insured named YR was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to YR's vehicle, that there was minor damage to the other vehicle, and that YR's vehicle was drivable following the accident. The police report further indicated that YR was not injured and that YR did not complain of any pain at the scene. In keeping with the fact that YR was not seriously injured, YR did not visit any hospital emergency room following the accident. To the extent that YR experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of YR at Primera Health on February 23, 2022, Primera Health, Izaguirre, and Carreras billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved problems of moderate severity.

(iii)    On October 20, 2022, an insured named FG was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to FG's vehicle, that there was minor damage to the other vehicle, and that FG's vehicle was drivable following the accident. The police report further indicated that FG was not injured and that FG did not complain of any pain at the scene. In keeping with the fact that FG was not seriously injured, FG did not visit any hospital emergency room following the accident. To the extent that FG experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of FG at Tampa Healthcare on October 22, 2022, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved problems of moderate to high severity.

(iv)    On December 15, 2022, an insured named CQ was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to CQ's vehicle, and that CQ's vehicle was drivable following the accident. The police report further indicated that CQ was not injured and that CQ did not complain of any pain at the scene. In keeping with the fact that CQ was not seriously injured, CQ did not visit any hospital emergency room following the accident. To the

extent that CQ experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of CQ at Primera Health on December 19, 2022, Matos, Primera Health, and Izaguirre billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved problems of moderate severity.

(v)     On February 10, 2023, an insured named GH was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to GH's vehicle, that there was minor damage to the other vehicle, and that GH's vehicle was drivable following the accident. The police report further indicated that GH was not injured and that GH did not complain of any pain at the scene. In keeping with the fact that GH was not seriously injured, GH did not visit any hospital emergency room following the accident. To the extent that GH experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of GH at Primera Health on February 23, 2023, Matos, Primera Health, and Izaguirre billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved problems of moderate severity.

(vi)    On August 17, 2023, an insured named ND was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to ND's vehicle, that there was minor damage to the other vehicle, and that ND's vehicle was drivable following the accident. The police report further indicated that ND was not injured and that ND did not complain of any pain at the scene. In keeping with the fact that ND was not seriously injured, ND did not visit any hospital emergency room following the accident. To the extent that ND experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of ND at Health Clinic Rehab on August 21, 2023, Matos, Health Clinic Rehab, and Sosa billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved problems of moderate to high severity.

(vii)   On September 6, 2023, an insured named AM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AM's vehicle, that there was minor damage to the other vehicle, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and that AM did not complain of any pain at the scene. In keeping with the

fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of AM at Primera Health on September 6, 2023, Matos, Primera Health, and Izaguirre billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved problems of moderate severity.

(viii)   On October 2, 2023, an insured named YC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to YC's vehicle, that there was minor damage to the other vehicle, and that YC's vehicle was drivable following the accident. The police report further indicated that YC was not injured and that YC did not complain of any pain at the scene. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of YC at Tampa Healthcare on October 3, 2023, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved problems of moderate to high severity.

(ix)   On November 29, 2023, an insured named AC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AC's vehicle, that there was minor damage to the other vehicle, and that AC's vehicle was drivable following the accident. The police report further indicated that AC was not injured and that AC did not complain of any pain at the scene. In keeping with the fact that AC was not seriously injured, AC did not visit any hospital emergency room following the accident. To the extent that AC experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of AC at Health Clinic Rehab on December 4, 2023, Matos, Health Clinic Rehab, and Sosa billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved problems of moderate to high severity.

(x)   On March 13, 2024, an insured named PA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to PA's vehicle, and that PA's vehicle was drivable

following the accident. The police report further indicated that PA was not injured and that PA did not complain of any pain at the scene. In keeping with the fact that PA was not seriously injured, PA did not visit any hospital emergency room following the accident. To the extent that PA experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of PA at Tampa Healthcare on March 20, 2024, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved problems of moderate to high severity.

(xi)    On March 27, 2024, an insured named ES was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to ES's vehicle, that there was minor damage to the other vehicle, and that ES's vehicle was drivable following the accident. The police report further indicated that ES was not injured and that ES did not complain of any pain at the scene. In keeping with the fact that ES was not seriously injured, ES did not visit any hospital emergency room following the accident. To the extent that ES experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of ES at Tampa Healthcare on March 28, 2024, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved problems of moderate to high severity.

(xii)   On August 15, 2024, an insured named AH was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AH's vehicle, that there was minor damage to the other vehicle, and that AH's vehicle was drivable following the accident. The police report further indicated that AH was not injured and that AH did not complain of any pain at the scene. In keeping with the fact that AH was not seriously injured, AH did not visit any hospital emergency room following the accident. To the extent that AH experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of AH at Blue Sea Rehab on August 21, 2024, Matos, Blue Sea Rehab, and Machin billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved problems of moderate severity.

(xiii)  On October 8, 2024, an insured named DC was involved in an

automobile accident. The contemporaneous police report indicated that DC was not injured and that DC did not complain of any pain at the scene. In keeping with the fact that DC was not seriously injured, DC did not visit any hospital emergency room following the accident. To the extent that DC experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of DC at Tampa Healthcare on October 15, 2024, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved problems of moderate to high severity.

(xiv)   On February 10, 2025, an insured named AD was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AD's vehicle, and that AD's vehicle was drivable following the accident. The police report further indicated that AD was not injured and that AD did not complain of any pain at the scene. In keeping with the fact that AD was not seriously injured, AD did not visit any hospital emergency room following the accident. To the extent that AD experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of AD at Blue Sea Rehab on February 12, 2025, Matos, Blue Sea Rehab, and Machin billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved problems of moderate severity.

(xv)   On February 14, 2025, an insured named DG was involved in an automobile accident. The contemporaneous police report indicated that DG was not injured and that DG did not complain of any pain at the scene. In keeping with the fact that DG was not seriously injured, DG did not visit any hospital emergency room following the accident. To the extent that DG experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of DG at Health Clinic Rehab on February 19, 2025, Matos, Health Clinic Rehab, and Sosa billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved problems of moderate to high severity.

(xvi)   On March 7, 2025, an insured named HD was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to HD's vehicle, that there was minor damage to the other vehicle, and that HD's vehicle was drivable following the accident. The police report further indicated that HD was not injured and that HD did

not complain of any pain at the scene. In keeping with the fact that HD was not seriously injured, HD did not visit any hospital emergency room following the accident. To the extent that HD experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of HD at Blue Sea Rehab on March 18, 2025, Matos, Blue Sea Rehab, and Machin billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved problems of moderate severity.

(xvii)  On April 6, 2025, an insured named SD was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to SD's vehicle, that there was minor damage to the other vehicle, and that SD's vehicle was drivable following the accident. The police report further indicated that SD was not injured and that SD did not complain of any pain at the scene. In keeping with the fact that SD was not seriously injured, SD did not visit any hospital emergency room following the accident. To the extent that SD experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of SD at Blue Sea Rehab on April 8, 2025, Matos, Blue Sea Rehab, and Machin billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved problems of moderate severity.

(xviii)  On May 30, 2025, an insured named YD was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to YD's vehicle, that there was minor damage to the other vehicle, and that YD's vehicle was drivable following the accident. The police report further indicated that YD was not injured and that YD did not complain of any pain at the scene. In keeping with the fact that YD was not seriously injured, YD did not visit any hospital emergency room following the accident. To the extent that YD experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of YD at Blue Sea Rehab on June 2, 2025, Matos, Blue Sea Rehab, and Machin billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved problems of moderate severity.

(xix)  On June 6, 2025, an insured named LE was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to LE's vehicle, that there was minor damage to the other

vehicle, and that LE's vehicle was drivable following the accident. The police report further indicated that LE was not injured and that LE did not complain of any pain at the scene. In keeping with the fact that LE was not seriously injured, LE did not visit any hospital emergency room following the accident. To the extent that LE experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of LE at Health Clinic Rehab on June 9, 2025, Matos, Health Clinic Rehab, and Sosa billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved problems of moderate to high severity.

(xx)    On July 30, 2025, an insured named AP was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AP's vehicle, that there was minor damage to the other vehicle, and that AP's vehicle was drivable following the accident. The police report further indicated that AP was not injured and that AP did not complain of any pain at the scene. In keeping with the fact that AP was not seriously injured, AP did not visit any hospital emergency room following the accident. To the extent that AP experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of AP at Health Clinic Rehab on July 31, 2025, Matos, Health Clinic Rehab, and Sosa billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved problems of moderate to high severity.

108.   These are only representative examples. In the claims for initial examinations identified in Exhibits "1" - "3" and "5", the Examination Defendants almost always falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity, when, in fact, the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the extent that the Insureds had any presenting problems at all as the result of their minor automobile accidents.

109.   In the claims for initial examinations identified in Exhibits "1" - "3" and

35

"5", the Examination Defendants almost always falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity in order to create a false basis for their charges for examinations billed under CPT codes 99203 and 99204, respectively, because the Examination Defendants were aware that examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

110.    In the claims for initial examinations identified in Exhibits "1" - "3" and "5", the Examination Defendants also almost always falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations, physical therapy, chiropractic, ESWT treatments, PENS treatments and implantable neurostimulator electrodes, HME, and other related services and goods.

**2.    Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

111.    What is more, in every claim identified in Exhibits "1" - "3" and "5" for initial examinations billed under CPT codes 99203 and 99204, the Examination Defendants misrepresented and exaggerated the total amount of time that the examining practitioners spent performing the putative initial examinations.

112.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an

initial examination represents that the physician or other practitioner who performed the examination spent at least 30 minutes of time performing the examination.

113.   When the respective Examination Defendants billed GEICO for their purported initial examinations using CPT code 99203, they represented that the examining practitioners spent at least 30 minutes of time performing the examinations of the Insureds.

114.   Similarly, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial examination represents that the physician or other practitioner who performed the examination spent at least 45 minutes of time performing the examination.

115.   When the respective Examination Defendants billed GEICO for their purported initial examinations using CPT code 99204, they represented that the examining practitioners spent at least 45 minutes of time performing the examinations of the Insureds.

116.   In fact, in the claims for initial examinations identified in Exhibits "1" - "3" and "5", no examining health care practitioner spent even 15 minutes of time performing the examinations of the Insureds – much less 30 minutes or 45 minutes – to the extent that the examinations were actually conducted at all.

117.   In keeping with the fact that the initial examinations identified in Exhibits "1" - "3" and "5" did not involve more than 15 minutes of time performing the examinations, the examining practitioners used templated forms in purporting to conduct the examinations.

118.   All that was required to complete the templated forms was a brief patient interview and a perfunctory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs and a limited check of the Insureds' systems.

119.   These interviews and examinations did not require any examining health care practitioner to spend more than 15 minutes of time performing the putative initial examinations.

120.   In the claims for initial examinations identified in Exhibits "1" - "3" and "5", the Examination Defendants routinely misrepresented the amount of time that was spent in conducting the initial examinations, because lengthier examinations that are billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that take less time to perform.

**3.   Misrepresentations Regarding the Extent of the Medical Decision-Making During the Initial Examinations**

121.   Pursuant to the CPT Assistant, there are four potential levels of medical decision-making in which a health care practitioner can engage in connection with an initial patient examination – namely: (i) straightforward medical decision-making; (ii) low complexity medical decision-making; (iii) moderate complexity medical decision-making; and (iv) high complexity medical decision-making.

122.   Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or management options to be considered; (ii) the amount and/or complexity of the medical records, diagnostic tests, and other information to be considered; and (iii) the risk of complications,

morbidity, and mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

123.   Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "low complexity" medical decision-making in connection with the examination.

124.   For an initial patient examination to legitimately entail "low complexity" medical decision-making, the examination typically must, among other things, involve: (i) the review and analysis of some of the patient's medical records or information regarding the patient's history obtained from an independent historian; and (ii) at least some real risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

125.   Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "moderate complexity" medical decision-making in connection with the examination.

126.   For an initial patient examination to legitimately entail "moderate complexity" medical decision-making, the examination typically must, among other things, involve: (i) the chronic illness, acute illness with systemic symptoms or complications, or an undiagnosed problem with an uncertain prognosis; (ii) the review

and analysis of a larger amount of the patient's medical records/history than would be required to satisfy "low complexity" medical decision-making; and (iii) at least a moderate risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

127.   As set forth above and in Exhibits "1" - "3" and "5", the Examination Defendants billed GEICO for almost all of their putative initial patient examinations of the Insureds using CPT codes 99203 and 99204, and thereby falsely represented that the examining practitioners engaged in genuine low complexity medical decision-making or genuine moderate complexity medical decision-making, respectively, in connection with the initial examinations.

128.   In fact, and to the extent that the Insureds in the claims identified in Exhibits "1" - "3" and "5" had any presenting problems at all as the result of their minor automobile accidents, the problems almost always were minor soft tissue injuries such as sprains and strains.

129.   The diagnosis and treatment of these minor soft tissue injuries did not require any legitimate low complexity medical decision-making or any legitimate moderate complexity medical decision-making.

130.   First, in the Examination Defendants' claims for initial examinations identified in Exhibits "1" - "3" and "5", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

131.   When the Insureds in the claims identified in Exhibits "1" - "3" and "5"

40

presented to Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab for "treatment", they did not arrive with any significant medical records.

132.    Furthermore, prior to the initial examinations, the Examination Defendants and their associates did not request any significant medical records from any other providers regarding the Insureds, nor did they provide, review, or analyze any complex medical records, diagnostic tests, or other information in connection with the examinations.

133.    Second, in the Examination Defendants' claims for initial examinations identified in Exhibits "1" - "3" and "5", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft tissue complaints, to the extent that the Insureds had any continuing complaints arising from their minor automobile accidents at all.

134.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided during the initial examinations, to the extent that any such diagnostic procedures or treatment options were provided in the first instance.

135.    Rather, to the extent that the initial examinations were conducted in the first instance, the examining practitioners – at the direction of the Examination Defendants – provided a substantially similar, pre-determined, and false series of soft tissue injury "diagnoses" for each Insured, and prescribed a virtually identical course of medically unnecessary treatment for each Insured.

136.    Specifically, in almost every instance in the claims identified in Exhibits

41

"1" - "3" and "5", during the initial examinations, the Insureds did not report any serious continuing medical problems that legitimately could be traced to an underlying automobile accident.

137.   Even so, the examining practitioners – at the direction of the Examination Defendants – prepared initial examination reports in which they provided false, boilerplate sprain/strain and similar soft tissue "diagnoses" to virtually every Insured.

138.   Then, based upon these artificial "diagnoses", the examining practitioners – at the direction of the Examination Defendants – falsely diagnosed almost every insured in the claims identified in Exhibits "1" - "3" and "5" with a purported "emergency medical condition", and then directed the Insureds to undergo a series of medically unnecessary follow-up examinations, physical therapy, chiropractic, and related services and goods.

139.   For example:

(i)   On April 1, 2022, an insured named LR was involved in an automobile accident. The contemporaneous police report indicated that LR was not injured and that LR did not complain of any pain at the scene. In keeping with the fact that LR was not seriously injured, LR did not visit any hospital emergency room following the accident. To the extent that LR experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On April 4, 2022, LR purportedly received an initial examination at Primera Health. To the extent that the examination was performed in the first instance, the examining practitioner – a physician named Victor Augusto Silva, M.D. ("Silva") – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Silva did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Silva – at the

direction of Primera Health, Izaguirre, and King – provided LR with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Silva falsely diagnosed LR with a purported "emergency medical condition". Furthermore, neither LR's presenting problems nor the treatment plan provided to LR by Silva presented any risk of significant complications, morbidity, or mortality. On the contrary, LR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Silva consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to LR. Even so, Primera Health, Izaguirre, and King billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(ii)    On February 11, 2023, an insured named WD was involved in an automobile accident. The contemporaneous police report indicated that WD was not injured and that WD did not complain of any pain at the scene. In keeping with the fact that WD was not seriously injured, WD did not visit any hospital emergency room following the accident. To the extent that WD experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On February 16, 2023, WD purportedly received an initial examination at Primera Health. To the extent that the examination was performed in the first instance, the examining practitioner – Matos – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Matos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Matos – at the direction of Primera Health and Izaguirre – provided WD with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Matos falsely diagnosed WD with a purported "emergency medical condition". Furthermore, neither WD's presenting problems nor the treatment plan provided to WD by Matos presented any risk of significant complications, morbidity, or mortality. On the contrary, WD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Matos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to WD. Even so, Matos, Primera Health, and Izaguirre billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(iii)    On April 4, 2023, an insured named MR was involved in an automobile accident. The contemporaneous police report indicated that MR was not injured and that MR did not complain of any pain at the scene. In keeping with the fact that MR was not seriously injured, MR did not visit any hospital emergency room following the accident. To the extent that MR experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On April 4, 2023, MR purportedly received an initial examination at Primera Health. To the extent that the examination was performed in the first instance, the examining practitioner – Matos – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Matos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Matos – at the direction of Primera Health and Izaguirre – provided MR with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Matos falsely diagnosed MR with a purported "emergency medical condition". Furthermore, neither MR's presenting problems nor the treatment plan provided to MR by Matos presented any risk of significant complications, morbidity, or mortality. On the contrary, MR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Matos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MR. Even so, Matos, Primera Health, and Izaguirre billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(iv)    On April 27, 2023, an insured named JV was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to JV's vehicle, that there was minor damage to the other vehicle, and that JV's vehicle was drivable following the accident. The police report further indicated that JV was not injured and that JV did not complain of any pain at the scene. In keeping with the fact that JV was not seriously injured, JV did not visit any hospital emergency room following the accident. To the extent that JV experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On May 1, 2023, JV purportedly received an initial examination at Health Clinic Rehab. To the extent that the examination was performed in the first instance, the examining practitioner – Matos – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination.

Moreover, Matos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Matos – at the direction of Health Clinic Rehab and Sosa – provided JV with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Matos falsely diagnosed JV with a purported "emergency medical condition". Furthermore, neither JV's presenting problems nor the treatment plan provided to JV by Matos presented any risk of significant complications, morbidity, or mortality. On the contrary, JV did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Matos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JV. Even so, Matos, Health Clinic Rehab, and Sosa billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(v)     On August 16, 2023, an insured named YB was involved in an automobile accident. The contemporaneous police report indicated that YB was not injured and that YB did not complain of any pain at the scene. In keeping with the fact that YB was not seriously injured, YB did not visit any hospital emergency room following the accident. To the extent that YB experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On August 17, 2023, YB purportedly received an initial examination at Tampa Healthcare. To the extent that the examination was performed in the first instance, the examining practitioner – Matos – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Matos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Matos – at the direction of Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus – provided YB with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Matos falsely diagnosed YB with a purported "emergency medical condition". Furthermore, neither YB's presenting problems nor the treatment plan provided to YB by Matos presented any risk of significant complications, morbidity, or mortality. On the contrary, YB did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Matos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to YB. Even so, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some

legitimate, moderate complexity medical decision-making.

(vi)  On August 17, 2023, an insured named JP was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to JP's vehicle, that there was minor damage to the other vehicle, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured and that JP did not complain of any pain at the scene. In keeping with the fact that JP was not seriously injured, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On August 21, 2023, JP purportedly received an initial examination at Health Clinic Rehab. To the extent that the examination was performed in the first instance, the examining practitioner – Matos – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Matos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Matos – at the direction of Health Clinic Rehab and Sosa – provided JP with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Matos falsely diagnosed JP with a purported "emergency medical condition". Furthermore, neither JP's presenting problems nor the treatment plan provided to JP by Matos presented any risk of significant complications, morbidity, or mortality. On the contrary, JP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Matos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JP. Even so, Matos, Health Clinic Rehab, and Sosa billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(vii)  On November 29, 2023, an insured named ND was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to ND's vehicle, that there was minor damage to the other vehicle, and that ND's vehicle was drivable following the accident. The police report further indicated that ND was not injured and that ND did not complain of any pain at the scene. In keeping with the fact that ND was not seriously injured, ND did not visit any hospital emergency room following the accident. To the extent that ND experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency

medical condition". On December 4, 2023, ND purportedly received an initial examination at Health Clinic Rehab. To the extent that the examination was performed in the first instance, the examining practitioner – Matos – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Matos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Matos – at the direction of Health Clinic Rehab and Sosa – provided ND with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Matos falsely diagnosed ND with a purported "emergency medical condition". Furthermore, neither ND's presenting problems nor the treatment plan provided to ND by Matos presented any risk of significant complications, morbidity, or mortality. On the contrary, ND did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Matos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to ND. Even so, Matos, Health Clinic Rehab, and Sosa billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(viii)  On December 6, 2023, an insured named MD was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to MD's vehicle, that there was minor damage to the other vehicle, and that MD's vehicle was drivable following the accident. The police report further indicated that MD was not injured and that MD did not complain of any pain at the scene. In keeping with the fact that MD was not seriously injured, MD did not visit any hospital emergency room following the accident. To the extent that MD experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On December 20, 2023, MD purportedly received an initial examination at Tampa Healthcare. To the extent that the examination was performed in the first instance, the examining practitioner – Matos – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Matos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Matos – at the direction of Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus – provided MD with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Matos falsely diagnosed MD with a purported "emergency medical condition". Furthermore, neither MD's presenting problems nor the

treatment plan provided to MD by Matos presented any risk of significant complications, morbidity, or mortality. On the contrary, MD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Matos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MD. Even so, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(ix)    On February 13, 2024, an insured named RG was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to RG's vehicle, that there was minor damage to the other vehicle, and that RG's vehicle was drivable following the accident. The police report further indicated that RG was not injured and that RG did not complain of any pain at the scene. In keeping with the fact that RG was not seriously injured, RG did not visit any hospital emergency room following the accident. To the extent that RG experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On February 15, 2024, RG purportedly received an initial examination at Tampa Healthcare. To the extent that the examination was performed in the first instance, the examining practitioner – a physician named Murthy S. Ravipati, M.D. ("Ravipati") – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ravipati did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ravipati – at the direction of Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus – provided RG with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Ravipati falsely diagnosed RG with a purported "emergency medical condition". Furthermore, neither RG's presenting problems nor the treatment plan provided to RG by Ravipati presented any risk of significant complications, morbidity, or mortality. On the contrary, RG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Ravipati consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to RG. Even so, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(x)     On February 16, 2024, an insured named LH was involved in an automobile accident. The contemporaneous police report indicated that LH was not injured and that LH did not complain of any pain at the scene. In keeping with the fact that LH was not seriously injured, LH did not visit any hospital emergency room following the accident. To the extent that LH experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On February 19, 2024, LH purportedly received an initial examination at Tampa Healthcare. To the extent that the examination was performed in the first instance, the examining practitioner – Matos – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Matos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Matos – at the direction of Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus – provided LH with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Matos falsely diagnosed LH with a purported "emergency medical condition". Furthermore, neither LH's presenting problems nor the treatment plan provided to LH by Matos presented any risk of significant complications, morbidity, or mortality. On the contrary, LH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Matos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to LH. Even so, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(xi)    On May 25, 2024, an insured named HA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to HA's vehicle, that there was minor damage to the other vehicle, and that HA's vehicle was drivable following the accident. The police report further indicated that HA was not injured and that HA did not complain of any pain at the scene. In keeping with the fact that HA was not seriously injured, HA did not visit any hospital emergency room following the accident. To the extent that HA experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On May 30, 2024, HA purportedly received an initial examination at Primera Health. To the extent that the examination was performed in the first instance, the examining practitioner – Matos – did not retrieve, review, or analyze any significant amount of medical records, diagnostic

tests, or other information in connection with the examination. Moreover, Matos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Matos – at the direction of Primera Health and Izaguirre – provided HA with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Matos falsely diagnosed HA with a purported "emergency medical condition". Furthermore, neither HA's presenting problems nor the treatment plan provided to HA by Matos presented any risk of significant complications, morbidity, or mortality. On the contrary, HA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Matos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to HA. Even so, Matos, Primera Health, and Izaguirre billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(xii)   On June 13, 2024, an insured named CB was involved in an automobile accident. The contemporaneous police report indicated that CB was not injured and that CB did not complain of any pain at the scene. In keeping with the fact that CB was not seriously injured, CB did not visit any hospital emergency room following the accident. To the extent that CB experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On June 19, 2024, CB purportedly received an initial examination at Primera Health. To the extent that the examination was performed in the first instance, the examining practitioner – Matos – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Matos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Matos – at the direction of Primera Health and Izaguirre – provided CB with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Matos falsely diagnosed CB with a purported "emergency medical condition". Furthermore, neither CB's presenting problems nor the treatment plan provided to CB by Matos presented any risk of significant complications, morbidity, or mortality. On the contrary, CB did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Matos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to CB. Even so, Matos, Primera Health, and Izaguirre billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed

some legitimate, low complexity medical decision-making.

(xiii)    On June 15, 2024, an insured named JS was involved in an automobile accident. The contemporaneous police report indicated that JS was not injured and that JS did not complain of any pain at the scene. In keeping with the fact that JS was not seriously injured, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On June 18, 2024, JS purportedly received an initial examination at Blue Sea Rehab. To the extent that the examination was performed in the first instance, the examining practitioner – Matos – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Matos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Matos – at the direction of Blue Sea Rehab and Machin – provided JS with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Matos falsely diagnosed JS with a purported "emergency medical condition". Furthermore, neither JS's presenting problems nor the treatment plan provided to JS by Matos presented any risk of significant complications, morbidity, or mortality. On the contrary, JS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Matos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JS. Even so, Matos, Blue Sea Rehab, and Machin billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(xiv)    On December 8, 2024, an insured named AM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AM's vehicle, that there was minor damage to the other vehicle, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and that AM did not complain of any pain at the scene. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On December 16, 2024, AM purportedly received an initial examination at Tampa Healthcare. To the extent that the examination was performed in the first instance, the examining

practitioner – Matos – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Matos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Matos – at the direction of Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus – provided AM with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Matos falsely diagnosed AM with a purported "emergency medical condition". Furthermore, neither AM's presenting problems nor the treatment plan provided to AM by Matos presented any risk of significant complications, morbidity, or mortality. On the contrary, AM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Matos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AM. Even so, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(xv)     On December 21, 2024, an insured named RL was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to RL's vehicle, that there was minor damage to the other vehicle, and that RL's vehicle was drivable following the accident. The police report further indicated that RL was not injured and that RL did not complain of any pain at the scene. In keeping with the fact that RL was not seriously injured, RL did not visit any hospital emergency room following the accident. To the extent that RL experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On December 26, 2024, RL purportedly received an initial examination at Health Clinic Rehab. To the extent that the examination was performed in the first instance, the examining practitioner – Matos – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Matos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Matos – at the direction of Health Clinic Rehab and Sosa – provided RL with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Matos falsely diagnosed RL with a purported "emergency medical condition". Furthermore, neither RL's presenting problems nor the treatment plan provided to RL by Matos presented any risk of significant complications, morbidity, or mortality. On the contrary, RL did not need any significant treatment at all as a

52

result of the accident, and the treatment plan provided by Matos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to RL. Even so, Matos, Health Clinic Rehab, and Sosa billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(xvi)   On March 7, 2025, an insured named IQ was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to IQ's vehicle, that there was minor damage to the other vehicle, and that IQ's vehicle was drivable following the accident. The police report further indicated that IQ was not injured and that IQ did not complain of any pain at the scene. In keeping with the fact that IQ was not seriously injured, IQ did not visit any hospital emergency room following the accident. To the extent that IQ experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On March 18, 2025, IQ purportedly received an initial examination at Blue Sea Rehab. To the extent that the examination was performed in the first instance, the examining practitioner – Matos – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Matos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Matos – at the direction of Blue Sea Rehab and Machin – provided IQ with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Matos falsely diagnosed IQ with a purported "emergency medical condition". Furthermore, neither IQ's presenting problems nor the treatment plan provided to IQ by Matos presented any risk of significant complications, morbidity, or mortality. On the contrary, IQ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Matos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to IQ. Even so, Matos, Blue Sea Rehab, and Machin billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(xvii)   On March 14, 2025, an insured named BV was involved in an automobile accident. The contemporaneous police report indicated that BV was not injured and that BV did not complain of any pain at the scene. In keeping with the fact that BV was not seriously injured, BV did not visit any hospital emergency room following the accident. To the extent that BV

experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On March 27, 2025, BV purportedly received an initial examination at Health Clinic Rehab. To the extent that the examination was performed in the first instance, the examining practitioner – Matos – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Matos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Matos – at the direction of Health Clinic Rehab and Sosa – provided BV with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Matos falsely diagnosed BV with a purported "emergency medical condition". Furthermore, neither BV's presenting problems nor the treatment plan provided to BV by Matos presented any risk of significant complications, morbidity, or mortality. On the contrary, BV did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Matos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to BV. Even so, Matos, Health Clinic Rehab, and Sosa billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(xviii) On May 20, 2025, an insured named EE was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to EE's vehicle, that there was minor damage to the other vehicle, and that EE's vehicle was drivable following the accident. The police report further indicated that EE was not injured and that EE did not complain of any pain at the scene. In keeping with the fact that EE was not seriously injured, EE did not visit any hospital emergency room following the accident. To the extent that EE experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On May 21, 2025, EE purportedly received an initial examination at Blue Sea Rehab. To the extent that the examination was performed in the first instance, the examining practitioner – Matos – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Matos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Matos – at the direction of Blue Sea Rehab and Machin – provided EE with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Matos falsely diagnosed EE with a purported "emergency medical condition".

Furthermore, neither EE's presenting problems nor the treatment plan provided to EE by Matos presented any risk of significant complications, morbidity, or mortality. On the contrary, EE did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Matos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to EE. Even so, Matos, Blue Sea Rehab, and Machin billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(xix)   On June 20, 2025, an insured named GR was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to GR's vehicle, that there was minor damage to the other vehicle, and that GR's vehicle was drivable following the accident. The police report further indicated that GR was not injured and that GR did not complain of any pain at the scene. In keeping with the fact that GR was not seriously injured, GR did not visit any hospital emergency room following the accident. To the extent that GR experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On June 25, 2025, GR purportedly received an initial examination at Blue Sea Rehab. To the extent that the examination was performed in the first instance, the examining practitioner – a physician named Livino Antonio Lora-Cruz, M.D. ("Lora-Cruz") – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lora-Cruz did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lora-Cruz – at the direction of Matos, Blue Sea Rehab, and Machin – provided GR with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Lora-Cruz falsely diagnosed GR with a purported "emergency medical condition". Furthermore, neither GR's presenting problems nor the treatment plan provided to GR by Lora-Cruz presented any risk of significant complications, morbidity, or mortality. On the contrary, GR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Lora-Cruz consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to GR. Even so, Matos, Blue Sea Rehab, and Machin billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(xx)   On July 14, 2025, an insured named YR was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to YR's vehicle, and that YR's vehicle was drivable following the accident. The police report further indicated that YR was not injured and that YR did not complain of any pain at the scene. In keeping with the fact that YR was not seriously injured, YR did not visit any hospital emergency room following the accident. To the extent that YR experienced any health problems at all as a result of the accident, they were of minimal severity, and did not constitute any kind of "emergency medical condition". On July 21, 2025, YR purportedly received an initial examination at Blue Sea Rehab. To the extent that the examination was performed in the first instance, the examining practitioner – Matos – did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Matos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Matos – at the direction of Blue Sea Rehab and Machin – provided YR with a false list of objectively unverifiable soft tissue injury "diagnoses", and then Matos falsely diagnosed YR with a purported "emergency medical condition". Furthermore, neither YR's presenting problems nor the treatment plan provided to YR by Matos presented any risk of significant complications, morbidity, or mortality. On the contrary, YR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Matos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to YR. Even so, Matos, Blue Sea Rehab, and Machin billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

140.   These are only representative examples. In the claims for initial examinations identified in Exhibits "1" - "3" and "5", the Examination Defendants routinely and falsely represented that the examinations involved legitimate low complexity medical decision-making (when billed under CPT code 99203) and legitimate moderate complexity medical decision-making (when billed under CPT code 99204), when, in fact, they did not.

141.   There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

142.   An individual's age, height, weight, general physical condition, location within the vehicle, and location of the impact will all affect whether, how, and to what extent an individual is injured in a given automobile accident.

143.   As set forth herein, in the claims identified in Exhibits "1" - "3" and "5", almost all of the Insureds whom the Defendants purported to treat were involved in relatively minor accidents.

144.   It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" - "3" and "5" would suffer substantially similar injuries as the result of their accidents, or require a substantially similar course of treatment.

145.   It is even more improbable – to the point of impossibility – that this kind of pattern would recur with great frequency within the cohort of patients treating at Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab, with numerous instances in which two or more patients who had been involved in the same accident supposedly presented with substantially similar symptoms warranting substantially similar diagnoses and treatment.

146.   Even so, in keeping with the fact that the Examination Defendants' putative "diagnoses" were pre-determined and false, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, the examining practitioners at Primera Health, Health Clinic Rehab, Tampa

Healthcare, and Blue Sea Rehab – at the direction of the Examination Defendants – frequently issued substantially similar, false "diagnoses", on or around the same date, to more than one Insured involved in a single accident, and recommended a substantially similar course of medically unnecessary treatment to the Insureds, despite the fact that each of the Insureds was differently situated.

147.   For example:

(i)   On March 9, 2021, two Insureds – FB and JS – were involved in the same automobile accident. Thereafter, both Insureds presented at Primera Health for initial examinations on the exact same date, March 22, 2021. FB and JS: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that FB and JS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Primera Health, Izaguirre, Carreras, and Silva provided FB and JS with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ii)   On March 14, 2022, two Insureds – JC and JV – were involved in the same automobile accident. Thereafter, both Insureds presented at Primera Health for initial examinations on the exact same date, March 16, 2022. JC and JV: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that JC and JV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Primera Health, Izaguirre, and Carreras provided JC and JV with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(iii)   On January 17, 2023, three Insureds – ND, CG, and ZD – were involved in the same automobile accident. Thereafter, all three Insureds presented at Health Clinic Rehab for initial examinations on the exact same date, January 18, 2023. ND, CG, and ZD: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the

vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that ND, CG, and ZD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Matos, Health Clinic Rehab, and Sosa provided ND, CG, and ZD with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(iv)     On March 15, 2023, four Insureds – CB, OP, RB, and BP – were involved in the same automobile accident. Thereafter, all four Insureds presented at Health Clinic Rehab for initial examinations on the exact same date, March 20, 2023. CB, OP, RB, and BP: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that CB, OP, RB, and BP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Matos, Health Clinic Rehab, and Sosa provided CB, OP, RB, and BP with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all four of them.

(v)      On March 15, 2023, two Insureds – MV and RS – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Healthcare for initial examinations on the exact same date, March 16, 2023. MV and RS: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that MV and RS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus provided MV and RS with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(vi)     On May 22, 2023, three Insureds – KC, RJ, and LJ – were involved in the same automobile accident. Thereafter, all three Insureds presented at Primera Health for initial examinations on the exact same date, June 1, 2023. KC, RJ, and LJ: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that KC, RJ, and LJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Matos, Primera Health, and Izaguirre

provided KC, RJ, and LJ with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(vii)   On September 4, 2023, two Insureds – YC and RP – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Healthcare for initial examinations on the exact same date, September 5, 2023. YC and RP: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that YC and RP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus provided YC and RP with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(viii)   On October 1, 2023, two Insureds – WI and CD – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Healthcare for initial examinations on the exact same date, October 2, 2023. WI and CD: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that WI and CD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus provided WI and CD with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ix)   On November 17, 2023, three Insureds – VZ, RO, and SH – were involved in the same automobile accident. Thereafter, all three Insureds presented at Primera Health for initial examinations on the exact same date, November 22, 2023. VZ, RO, and SH: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that VZ, RO, and SH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Matos, Primera Health, and Izaguirre provided VZ, RO, and SH with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(x)     On January 28, 2024, two Insureds – RP and YC – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Healthcare for initial examinations on the exact same date, January 29, 2024. RP and YC: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that RP and YC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus provided RP and YC with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xi)    On February 2, 2024, three Insureds – LR, RR, and VV – were involved in the same automobile accident. Thereafter, all three Insureds presented at Health Clinic Rehab for initial examinations on the exact same date, February 5, 2024. LR, RR, and VV: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that LR, RR, and VV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Matos, Health Clinic Rehab, and Sosa provided LR, RR, and VV with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(xii)   On June 24, 2024, two Insureds – JB and GT – were involved in the same automobile accident. Thereafter, both Insureds presented at Primera Health for initial examinations on the exact same date, June 27, 2024. JB and GT: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that JB and GT suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Matos, Primera Health, and Izaguirre provided JB and GT with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xiii)  On October 24, 2024, three Insureds – JS, AL, and BP – were involved in the same automobile accident. Thereafter, all three Insureds presented at Health Clinic Rehab for initial examinations on the exact same date, October 29, 2024. JS, AL, and BP: (a) were different ages; (b) were in

different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that JS, AL, and BP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Matos, Health Clinic Rehab, and Sosa provided JS, AL, and BP with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(xiv)    On December 23, 2024, three Insureds – SG, JG, and YE – were involved in the same automobile accident. Thereafter, all three Insureds presented at Blue Sea Rehab for initial examinations on the exact same date, January 2, 2025. SG, JG, and YE: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that SG, JG, and YE suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Matos, Blue Sea Rehab, and Machin provided SG, JG, and YE with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(xv)    On January 18, 2025, three Insureds – BL, EN, and IG – were involved in the same automobile accident. Thereafter, all three Insureds presented at Health Clinic Rehab for initial examinations on the exact same date, January 30, 2025. BL, EN, and IG: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that BL, EN, and IG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Matos, Health Clinic Rehab, and Sosa provided BL, EN, and IG with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(xvi)    On February 12, 2025, two Insureds – KV and JC – were involved in the same automobile accident. Thereafter, both Insureds presented at Blue Sea Rehab for initial examinations on the exact same date, February 12, 2025. KV and JC: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that KV and JC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial

examinations, Matos, Blue Sea Rehab, and Machin provided KV and JC with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xvii)    On April 22, 2025, two Insureds – JB and JP – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Healthcare for initial examinations on the exact same date, April 22, 2025. JB and JP: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that JB and JP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus provided JB and JP with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xviii)    On May 6, 2025, two Insureds – GR and MC – were involved in the same automobile accident. Thereafter, both Insureds presented at Blue Sea Rehab for initial examinations on the exact same date, May 7, 2025. GR and MC: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that GR and MC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Matos, Blue Sea Rehab, and Machin provided GR and MC with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xix)    On June 1, 2025, two Insureds – LF and RV – were involved in the same automobile accident. Thereafter, both Insureds presented at Blue Sea Rehab for initial examinations on the exact same date, June 2, 2025. LF and RV: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that LF and RV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Matos, Blue Sea Rehab, and Machin provided LF and RV with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xx)    On June 15, 2025, two Insureds – LT and GG – were involved in the same automobile accident. Thereafter, both Insureds presented at Blue Sea Rehab for initial examinations on the exact same date, June 18, 2025. LT and GG: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that LT and GG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Matos, Blue Sea Rehab, and Machin provided LT and GG with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

148.    These are only representative examples. In the claims for initial examinations identified in Exhibits "1" - "3" and "5", the Examination Defendants frequently issued substantially similar "diagnoses" – on or around the same date – to more than one Insured involved in a single accident, and recommended a substantially similar course of medically unnecessary "treatment" to the Insureds, despite the fact that each of the Insureds was differently situated and, in any case, did not require the treatment.

149.    The Examination Defendants routinely caused these false "diagnoses" to be inserted into their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

150.    In the claims for initial examinations identified in Exhibits "1" - "3" and "5", the Examination Defendants routinely and falsely represented that the putative initial examinations involved legitimate low complexity medical decision-making or

legitimate moderate complexity medical decision-making, in order to create a false basis to bill for the initial examinations under CPT codes 99203 and 99204, respectively. This is because examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that do not require any complex medical decision-making at all.

151.   In this context, Matos, who purported to serve as medical director at each of Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab, did not legitimately perform the required duties of a clinic medical director at Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab.

152.   Had Matos legitimately conducted systematic reviews of Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab's billings, Matos would have noted – among other things – that the respective billings routinely and fraudulently misrepresented the nature, extent, and results of the purported initial examinations at Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab.

153.   In this context, Carreras and King, who purported to serve as medical directors at Primera Health, did not legitimately perform the required duties of clinic medical directors at Primera Health.

154.   Had Carreras and King legitimately conducted systematic reviews of Primera Health's billings, Carreras and King would have noted – among other things – that the respective billings routinely and fraudulently misrepresented the nature, extent, and results of the purported initial examinations at Primera Health.

155.    In the claims for initial examinations identified in Exhibits "1" - "3" and "5", the Examination Defendants routinely and fraudulently misrepresented that the initial examinations were lawfully provided and eligible for PIP reimbursement, when, in fact, the initial examinations were neither lawfully provided nor reimbursable, because:

(i)    the putative initial examinations were illusory, with outcomes that were pre-determined to result in substantially identical, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative initial examinations misrepresented the nature, extent, and results of the examinations; and

(iii)    the Examination Defendants were never eligible to collect PIP Benefits in connection with the putative initial examinations in the first instance, inasmuch as Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab operated in violation of Florida law.

**C.    The Fraudulent and Unlawful Charges for Follow-Up Examinations at Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab**

156.    In addition to their fraudulent initial examinations, the Examination Defendants also purported to subject many of the Insureds in the claims identified in Exhibits "1" - "3" and "5" to one or more fraudulent follow-up examinations during the course of their fraudulent treatment protocols.

157.    As set forth in Exhibit "1", Matos, Primera Health, Izaguirre, Carreras, and King billed the follow-up examinations through Primera Health to GEICO under: (i) CPT code 99213, typically resulting in a charge of $159.24 for each follow-up examination they purported to provide; and (ii) CPT code 99215, typically resulting in

a charge of $314.82 for each follow-up examination they purported to provide.

158.   As set forth in Exhibit "2", Matos, Health Clinic Rehab, and Sosa billed the follow-up examinations through Health Clinic Rehab to GEICO under CPT code 99214, typically resulting in a charge of $259.42 for each follow-up examination they purported to provide.

159.   As set forth in Exhibit "3", Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed the follow-up examinations through Tampa Healthcare to GEICO under CPT code 99213, typically resulting in a charge of $179.48 for each follow-up examination they purported to provide.

160.   As set forth in Exhibit "5", Matos, Blue Sea Rehab, and Machin billed the follow-up examinations through Blue Sea Rehab to GEICO under CPT code 99213, typically resulting in a charge of $182.64 for each follow-up examination they purported to provide.

161.   In the claims for follow-up examinations identified in Exhibits "1" - "3" and "5", the charges for follow-up examinations were fraudulent in that they misrepresented the Examination Defendants' eligibility to collect PIP Benefits in the first instance.

162.   In fact, and as set forth herein, the Examination Defendants were never eligible to collect PIP Benefits, inasmuch as Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab operated in violation of Florida law.

163.   As set forth below, the charges for the follow-up examinations identified in Exhibits "1" - "3" and "5" were also fraudulent in that they misrepresented the

nature, extent, and results of the follow-up examinations.

1.    **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

164.   Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up patient examination typically represents that an insured presented with problems of low to moderate severity.

165.   The CPT Assistant provides various clinical examples of low to moderate severity presenting problems that would support the use of CPT code 99213 to bill for a follow-up patient examination, including:

(i)    Follow-up visit with a 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)   Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)  Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)   Routine, follow-up office evaluation at three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)    Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)   Quarterly follow-up visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)  Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

166.   Accordingly, pursuant to the CPT Assistant, the low to moderate severity

presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

167.    Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up patient examination typically represents that an insured presented with problems of moderate to high severity.

168.    The CPT Assistant provides various clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99214 to bill for a follow-up patient examination, including:

(i)    Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea, and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)    Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)    Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)    Office evaluation on new onset RLQ pain in a 32-year-old woman,

established patient. (Urology / General Surgery / Internal Medicine / Family Medicine)

(viii)   Office visit with a 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

169.   Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

170.   Moreover, pursuant to the CPT Assistant, the use of CPT code 99215 to bill for a follow-up patient examination typically represents that an insured presented with problems of moderate to high severity.

171.   The CPT Assistant provides various clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99215 to bill for a follow-up patient examination, including:

(i)   Office visit with 30-year-old male, established patient 3-month history of fatigue, weight loss, intermittent fever, and presenting with diffuse adenopathy and splenomegaly. (Family Medicine)

(ii)   Office evaluation and discussion of treatment options for a 68-year-old male with a biopsy-proven rectal carcinoma. (General Surgery)

(iii)   Office visit for restaging of an established patient with new lymphadenopathy one year post therapy for lymphoma. (Hematology/Oncology)

(iv)   Follow-up office visit for a 65-year-old male with a fever of recent onset while on outpatient antibiotic therapy for endocarditis. (Infectious Disease)

(v) Office visit for evaluation of recent onset syncopal attacks in a 70-year-old woman, established patient. (Internal Medicine)

(vi) Follow-up office visit for a 75-year-old patient with ALS (amyotrophic lateral sclerosis), who is no longer able to swallow. (Neurology)

(vii) Follow-up visit, 40-year-old mother of 3, with acute rheumatoid arthritis, anatomical Stage 3, ARA function Class 3 rheumatoid arthritis, and deteriorating function. (Rheumatology)

172. Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99215 to bill for a follow-up patient examination typically are problems that pose a critical threat to the patient's health, or even the patient's life.

173. By contrast, to the extent that the Insureds in the claims identified in Exhibits "1" - "3" and "5" suffered any injuries at all as the result of their minor automobile accidents, the injuries were minor soft tissue injuries – such as sprains and strains – which were not severe at all.

174. Ordinary soft tissue injuries such as sprains and strains almost always resolve after a short course of conservative treatment such as rest, ice, compression, and/or elevation of the affected body part(s), or no treatment at all.

175. By the time the Insureds in the claims identified in Exhibits "1" - "3" and "5" presented at Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab for the putative follow-up examinations – which typically was weeks or months after their accidents – the Insureds either did not have any genuine presenting problems at all as the result of their typically minor automobile accidents, or their problems were minimal.

176.    Even so, in the claims for follow-up examinations identified in Exhibits "1" - "3" and "5", the Examination Defendants routinely billed GEICO for their putative follow-up examinations under CPT codes 99213, 99214, and 99215, and thereby falsely represented that the Insureds continued to suffer from presenting problems of low to moderate severity or moderate to high severity, respectively, at the time of the purported follow-up examinations.

177.    For example:

(i)    On March 9, 2021, an Insured named JS was involved in an automobile accident. The contemporaneous police report indicated that JS was not injured and that JS did not complain of any pain at the scene. In keeping with the fact that JS was not seriously injured, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following two purported follow-up examinations of JS at Primera Health on May 19, 2021, and August 2, 2021, Primera Health, Izaguirre, and Silva billed GEICO for the follow-up examinations under CPT codes 99213 and 99215, and thereby falsely represented that the follow-up examinations involved presenting problems of low to moderate severity and moderate to high severity, respectively.

(ii)    On October 20, 2022, an Insured named CF was involved in an automobile accident. The contemporaneous police report indicated that CF was not injured and that CF did not complain of any pain at the scene. In keeping with the fact that CF was not seriously injured, CF did not visit any hospital emergency room following the accident. To the extent that CF experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of CF at Primera Health on December 16, 2022, Matos, Primera Health, and Izaguirre billed GEICO for the follow-up examination under CPT code 99213, and thereby falsely represented that the follow-up examination involved presenting problems of low to moderate severity.

(iii)  On December 15, 2022, an Insured named AB was involved in an automobile accident. The contemporaneous police report indicated that AB was not injured and that AB did not complain of any pain at the scene. In keeping with the fact that AB was not seriously injured, AB did not visit any hospital emergency room following the accident. To the extent that AB experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following two purported follow-up examinations of AB at Primera Health on February 10, 2023, and February 28, 2023, Matos, Primera Health, and Izaguirre billed GEICO for the follow-up examinations under CPT code 99215, and thereby falsely represented that the follow-up examinations involved presenting problems of moderate to high severity.

(iv)  On December 21, 2022, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that JR was not injured and that JR did not complain of any pain at the scene. In keeping with the fact that JR was not seriously injured, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following two purported follow-up examinations of JR at Health Clinic Rehab on February 8, 2023, and March 7, 2023, Matos, Health Clinic Rehab, and Sosa billed GEICO for the follow-up examinations under CPT code 99214, and thereby falsely represented that the follow-up examinations involved presenting problems of moderate to high severity.

(v)  On March 15, 2023, an Insured named MD was involved in an automobile accident. The contemporaneous police report indicated that MD was not injured and that MD did not complain of any pain at the scene. In keeping with the fact that MD was not seriously injured, MD did not visit any hospital emergency room following the accident. To the extent that MD experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following two purported follow-up examinations of MD at Health Clinic Rehab on June 7, 2023, and September 20, 2023, Matos, Health Clinic Rehab, and Sosa billed GEICO for the follow-up examinations under CPT code 99214, and thereby falsely represented that the follow-up examinations involved presenting problems of moderate to high severity.

(vi)  On May 14, 2023, an Insured named RA was involved in an automobile

accident. The contemporaneous police report indicated that RA was not injured and that RA did not complain of any pain at the scene. In keeping with the fact that RA was not seriously injured, RA did not visit any hospital emergency room following the accident. To the extent that RA experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of RA at Primera Health on June 27, 2023, Matos, Primera Health, and Izaguirre billed GEICO for the follow-up examination under CPT code 99213, and thereby falsely represented that the follow-up examination involved presenting problems of low to moderate severity.

(vii)    On June 26, 2023, an Insured named TL was involved in an automobile accident. The contemporaneous police report indicated that TL was not injured and that TL did not complain of any pain at the scene. In keeping with the fact that TL was not seriously injured, TL did not visit any hospital emergency room following the accident. To the extent that TL experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of TL at Health Clinic Rehab on September 28, 2023, Matos, Health Clinic Rehab, and Sosa billed GEICO for the follow-up examination under CPT code 99214, and thereby falsely represented that the follow-up examination involved presenting problems of moderate to high severity.

(viii)    On August 26, 2023, an Insured named SF was involved in an automobile accident. The contemporaneous police report indicated that SF was not injured and that SF did not complain of any pain at the scene. In keeping with the fact that SF was not seriously injured, SF did not visit any hospital emergency room following the accident. To the extent that SF experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of SF at Health Clinic Rehab on September 8, 2023, Matos, Health Clinic Rehab, and Sosa billed GEICO for the follow-up examination under CPT code 99214, and thereby falsely represented that the follow-up examination involved presenting problems of moderate to high severity.

(ix)    On September 6, 2023, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that

AM was not injured and that AM did not complain of any pain at the scene. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of AM at Primera Health on November 6, 2023, Matos, Primera Health, and Izaguirre billed GEICO for the follow-up examination under CPT code 99215, and thereby falsely represented that the follow-up examination involved presenting problems of moderate to high severity.

(x)    On October 2, 2023, an Insured named YC was involved in an automobile accident. The contemporaneous police report indicated that YC was not injured and that YC did not complain of any pain at the scene. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of YC at Tampa Healthcare on November 21, 2023, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the follow-up examination under CPT code 99213, and thereby falsely represented that the follow-up examination involved presenting problems of low to moderate severity.

(xi)    On February 13, 2024, an Insured named RG was involved in an automobile accident. The contemporaneous police report indicated that RG was not injured and that RG did not complain of any pain at the scene. In keeping with the fact that RG was not seriously injured, RG did not visit any hospital emergency room following the accident. To the extent that RG experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of RG at Tampa Healthcare on March 26, 2024, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the follow-up examination under CPT code 99213, and thereby falsely represented that the follow-up examination involved presenting problems of low to moderate severity.

(xii)    On March 14, 2024, an Insured named BM was involved in an automobile accident. The contemporaneous police report indicated that BM was not injured and that BM did not complain of any pain at the

scene. In keeping with the fact that BM was not seriously injured, BM did not visit any hospital emergency room following the accident. To the extent that BM experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following two purported follow-up examinations of BM at Health Clinic Rehab on May 2, 2024, and July 2, 2024, Matos, Health Clinic Rehab, and Sosa billed GEICO for the follow-up examinations under CPT code 99214, and thereby falsely represented that the follow-up examinations involved presenting problems of moderate to high severity.

(xiii)  On April 11, 2024, an Insured named NM was involved in an automobile accident. The contemporaneous police report indicated that NM was not injured and that NM did not complain of any pain at the scene. In keeping with the fact that NM was not seriously injured, NM did not visit any hospital emergency room following the accident. To the extent that NM experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of NM at Tampa Healthcare on July 3, 2024, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the follow-up examination under CPT code 99213, and thereby falsely represented that the follow-up examination involved presenting problems of low to moderate severity.

(xiv)  On December 8, 2024, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that AM was not injured and that AM did not complain of any pain at the scene. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of AM at Tampa Healthcare on March 3, 2025, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the follow-up examination under CPT code 99213, and thereby falsely represented that the follow-up examination involved presenting problems of low to moderate severity.

(xv)  On February 18, 2025, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that AM was not injured and that AM did not complain of any pain at the scene. In keeping with the fact that AM was not seriously injured, AM

did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of AM at Blue Sea Rehab on April 2, 2025, Matos, Blue Sea Rehab, and Machin billed GEICO for the follow-up examination under CPT code 99213, and thereby falsely represented that the follow-up examination involved presenting problems of low to moderate severity.

(xvi)   On March 25, 2025, an Insured named MS was involved in an automobile accident. The contemporaneous police report indicated that MS was not injured and that MS did not complain of any pain at the scene. In keeping with the fact that MS was not seriously injured, MS did not visit any hospital emergency room following the accident. To the extent that MS experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of MS at Blue Sea Rehab on April 30, 2025, Matos, Blue Sea Rehab, and Machin billed GEICO for the follow-up examination under CPT code 99213, and thereby falsely represented that the follow-up examination involved presenting problems of low to moderate severity.

(xvii)  On April 21, 2025, an Insured named YS was involved in an automobile accident. The contemporaneous police report indicated that YS was not injured and that YS did not complain of any pain at the scene. In keeping with the fact that YS was not seriously injured, YS did not visit any hospital emergency room following the accident. To the extent that YS experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of YS at Blue Sea Rehab on June 2, 2025, Matos, Blue Sea Rehab, and Machin billed GEICO for the follow-up examination under CPT code 99213, and thereby falsely represented that the follow-up examination involved presenting problems of low to moderate severity.

(xviii) On April 22, 2025, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that JP was not injured and that JP did not complain of any pain at the scene. In keeping with the fact that JP was not seriously injured, JP did not visit any hospital emergency room following the accident. To the extent that JP

experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of JP at Tampa Healthcare on July 15, 2025, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the follow-up examination under CPT code 99213, and thereby falsely represented that the follow-up examination involved presenting problems of low to moderate severity.

(xix)  On May 20, 2025, an Insured named EE was involved in an automobile accident. The contemporaneous police report indicated that EE was not injured and that EE did not complain of any pain at the scene. In keeping with the fact that EE was not seriously injured, EE did not visit any hospital emergency room following the accident. To the extent that EE experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of EE at Blue Sea Rehab on July 2, 2025, Matos, Blue Sea Rehab, and Machin billed GEICO for the follow-up examination under CPT code 99213, and thereby falsely represented that the follow-up examination involved presenting problems of low to moderate severity.

(xx)  On June 1, 2025, an Insured named RV was involved in an automobile accident. The contemporaneous police report indicated that RV was not injured and that RV did not complain of any pain at the scene. In keeping with the fact that RV was not seriously injured, RV did not visit any hospital emergency room following the accident. To the extent that RV experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of RV at Blue Sea Rehab on July 7, 2025, Matos, Blue Sea Rehab, and Machin billed GEICO for the follow-up examination under CPT code 99213, and thereby falsely represented that the follow-up examination involved presenting problems of low to moderate severity.

178.   These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" - "3" and "5", the Examination Defendants routinely and falsely represented that the Insureds presented with problems of low to

moderate severity or moderate to high severity, when, in fact, the Insureds either did not have any genuine presenting problems at all as the result of their typically minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

179.    In the claims for follow-up examinations identified in Exhibits "1" - "3" and "5", the Examination Defendants almost always falsely represented that the Insureds presented with problems of low to moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for the examinations billed under CPT codes 99213, 99214, and 99215, respectively, because examinations billable under CPT codes 99213, 99214, and 99215 are reimbursable at higher rates than examinations involving minimal severity or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

## 2.    Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations

180.    What is more, in the claims for follow-up examinations identified in Exhibits "1" - "3" and "5", no examining health care practitioner associated with the Examination Defendants ever took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

181.    Rather, following the purported follow-up examinations at the Examination Defendants' offices, the examining practitioners – at the direction of the

Examination Defendants – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and (ii) either: (a) referred the Insureds for even more medically unnecessary Fraudulent Services, despite the fact that the Insureds purportedly had already received extensive physical therapy and other Fraudulent Services that supposedly had not been successful in resolving their purported pain symptoms; or (b) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

182. The putative "follow-up examinations" that the Examination Defendants purported to provide the Insureds in the claims identified in Exhibits "1" - "3" and "5" were, therefore, medically useless, and played no legitimate role in the treatment or care of the Insureds. This is because the putative "results" of the examinations were pre-arranged to comport with the medically unnecessary treatment plans that were pre-determined for each Insured from the moment that they presented at the Examination Defendants' offices.

183. In this context, Matos, who purported to serve as medical director at each of the Clinic Defendants, did not legitimately perform the required duties of a clinic medical director at any of the Clinic Defendants.

184. Had Matos legitimately conducted systematic reviews of any of the Clinic Defendants' billings, Matos would have noted – among other things – that the respective Clinic Defendants' billings routinely and fraudulently misrepresented the nature, extent, and results of the purported follow-up examinations at Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab.

185.   In this context, Carreras and King, who purported to serve as medical directors at Primera Health, did not legitimately perform the required duties of clinic medical directors at Primera Health.

186.   Had Carreras and King legitimately conducted systematic reviews of Primera Health's billings, Carreras and King would have noted – among other things – that the respective billings routinely and fraudulently misrepresented the nature, extent, and results of the purported follow-up examinations at Primera Health.

187.   In the claims for follow-up examinations identified in Exhibits "1" - "3" and "5", the Examination Defendants routinely and falsely misrepresented that the follow-up examinations were lawfully provided and eligible for PIP reimbursement, when, in fact, the follow-up examinations were neither lawfully provided nor reimbursable, because:

(i)   the putative follow-up examinations were illusory, with outcomes that were pre-determined to result in substantially identical, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)   the charges for the putative follow-up examinations misrepresented the nature, extent, and results of the examinations; and

(iii)   the Examination Defendants were never eligible to collect PIP Benefits in connection with the putative follow-up examinations in the first instance, inasmuch as Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab operated in violation of Florida law.

## D.   The Defendants' Fraudulent and Unlawful Charges for "Physical Therapy" Services

188.   As part of their fraudulent and unlawful billing schemes, the Defendants almost always purported to subject the Insureds in the claims identified in Exhibits "1"

- "5" to months of medically unnecessary "physical therapy" treatments, which the Defendants then fraudulently and unlawfully billed to GEICO.

189.    As set forth in Exhibit "1", Matos, Primera Health, Izaguirre, Carreras, and King billed the "physical therapy" services through Primera Health to GEICO under:

(i)     CPT code 97010, for purported hot/cold pack treatments, typically resulting in a charge of $10.00 for each modality they purported to provide.

(ii)    CPT code 97012, for purported mechanical traction, typically resulting in a charge of $35.02 for each modality they purported to provide.

(iii)   CPT code 97014, for purported electrical stimulation, typically resulting in a charge of $25.28 for each modality they purported to provide.

(iv)    CPT code 97018, for purported paraffin bath treatments, typically resulting in a charge of $23.92 for each modality they purported to provide.

(v)     CPT code 97026, for purported infrared light therapy, typically resulting in a charge of $10.72 for each modality they purported to provide.

(vi)    CPT code 97035, for purported ultrasound treatments, typically resulting in a charge of $28.12 for each modality they purported to provide.

(vii)   CPT code 97039, for purported unspecified physical therapy treatments, typically resulting in a charge of $15.00 for each modality they purported to provide.

(viii)  CPT code 97110, for purported therapeutic exercises, typically resulting in a charge of $69.54 for each modality they purported to provide.

(ix)    CPT code 97112, for purported therapeutic neuromuscular reeducation, typically resulting in a charge of $72.56 for each modality they purported to provide.

(x)     CPT code 97124, for purported therapeutic massage, typically resulting in a charge of $57.20 for each modality they purported to provide.

(xi)   CPT code 97140, for purported manual therapy, typically resulting in a charge of $64.96 for each modality they purported to provide.

(xii)  CPT code 97530, for purported therapeutic activities, typically resulting in a charge of $75.56 for each modality they purported to provide.

(xiii) CPT code 97535, for purported self-care/home management training, typically resulting in a charge of $85.00 for each modality they purported to provide.

(xiv)  Healthcare Common Procedure Coding System ("HCPCS") code G0283, for purported electrical stimulation, typically resulting in a charge of $20.00 for each modality they purported to provide.

190.   As set forth in Exhibit "2", Matos, Health Clinic Rehab, and Sosa billed the "physical therapy" services through Health Clinic Rehab to GEICO under:

(i)    CPT code 97010, for purported hot/cold pack treatments, typically resulting in a charge of $14.65 for each modality they purported to provide.

(ii)   CPT code 97012, for purported mechanical traction, typically resulting in a charge of $31.58 for each modality they purported to provide.

(iii)  CPT code 97014, for purported electrical stimulation, typically resulting in a charge of $28.02 for each modality they purported to provide.

(iv)   CPT code 97016, for purported application of a vasopneumatic device, typically resulting in a charge of $43.44 for each modality they purported to provide.

(v)    CPT code 97018, for purported paraffin bath treatments, typically resulting in a charge of $15.26 for each modality they purported to provide.

(vi)   CPT code 97026, for purported infrared light therapy, typically resulting in a charge of $18.06 for each modality they purported to provide.

(vii)  CPT code 97035, for purported ultrasound treatments, typically resulting in a charge of $30.76 for each modality they purported to provide.

(viii)  CPT code 97039, for purported unspecified physical therapy treatments, typically resulting in a charge of $80.00 for each modality they purported to provide.

(ix)  CPT code 97110, for purported therapeutic exercises, typically resulting in a charge of $61.62 for each modality they purported to provide.

(x)  CPT code 97112, for purported therapeutic neuromuscular reeducation, typically resulting in a charge of $71.00 for each modality they purported to provide.

(xi)  CPT code 97139, for purported unlisted therapeutic procedures, typically resulting in a charge of $85.00 for each modality they purported to provide.

(xii)  CPT code 97140, for purported manual therapy, typically resulting in a charge of $56.94 for each modality they purported to provide.

(xiii)  CPT code 97530, for purported therapeutic activities, typically resulting in a charge of $78.62 for each modality they purported to provide.

(xiv)  CPT code 97535, for purported self-care/home management training, typically resulting in a charge of $68.18 for each modality they purported to provide.

(xv)  CPT code 97799, for purported physical medicine/rehabilitation services or procedures, typically resulting in a charge of $85.00 for each modality they purported to provide.

(xvi)  HCPCS code G0283, for purported electrical stimulation, typically resulting in a charge of $28.02 for each modality they purported to provide.

(xvii)  HCPCS code S8948, for purported "low-level laser" treatments, typically resulting in a charge of $80.00 for each modality they purported to provide.

191.  As set forth in Exhibit "3", Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed the "physical therapy" services through Tampa Healthcare to GEICO under:

(i)     CPT code 97010, for purported hot/cold pack treatments, typically resulting in a charge of $10.00 for each modality they purported to provide.

(ii)    CPT code 97012, for purported mechanical traction, typically resulting in a charge of $35.02 for each modality they purported to provide.

(iii)   CPT code 97018, for purported paraffin bath treatments, typically resulting in a charge of $23.92 for each modality they purported to provide.

(iv)    CPT code 97026, for purported infrared light therapy, typically resulting in a charge of $50.00 for each modality they purported to provide.

(v)     CPT code 97033, for purported iontophoresis, typically resulting in a charge of $45.00 for each modality they purported to provide.

(vi)    CPT code 97035, for purported ultrasound treatments, typically resulting in a charge of $28.12 for each modality they purported to provide.

(vii)   CPT code 97110, for purported therapeutic exercises, typically resulting in a charge of $69.54 for each modality they purported to provide.

(viii)  CPT code 97112, for purported therapeutic neuromuscular reeducation, typically resulting in a charge of $72.56 for each modality they purported to provide.

(ix)    CPT code 97140, for purported manual therapy, typically resulting in a charge of $64.96 for each modality they purported to provide.

(x)     CPT code 97530, for purported therapeutic activities, typically resulting in a charge of $75.56 for each modality they purported to provide.

(xi)    HCPCS code G0283, for purported electrical stimulation, typically resulting in a charge of $36.34 for each modality they purported to provide.

(xii)   HCPCS code S8948, for purported "low-level laser" treatments, typically resulting in a charge of $160.00 for each modality they purported to provide.

192.    As set forth in Exhibit "4", Matos, Allure Med, and Valdez billed the

"physical therapy" services through Allure Med to GEICO under:

(i)     CPT code 97010, for purported hot/cold pack treatments, typically resulting in a charge of $10.00 for each modality they purported to provide.

(ii)    CPT code 97012, for purported mechanical traction, typically resulting in a charge of $29.70 for each modality they purported to provide.

(iii)   CPT code 97016, for purported application of a vasopneumatic device, typically resulting in a charge of $24.68 for each modality they purported to provide.

(iv)    CPT code 97018, for purported paraffin bath treatments, typically resulting in a charge of $12.06 for each modality they purported to provide.

(v)     CPT code 97026, for purported infrared light therapy, typically resulting in a charge of $14.08 for each modality they purported to provide.

(vi)    CPT code 97035, for purported ultrasound treatments, typically resulting in a charge of $29.52 for each modality they purported to provide.

(vii)   CPT code 97110, for purported therapeutic exercises, typically resulting in a charge of $61.50 for each modality they purported to provide.

(viii)  CPT code 97112, for purported therapeutic neuromuscular reeducation, typically resulting in a charge of $70.46 for each modality they purported to provide.

(ix)    CPT code 97140, for purported manual therapy, typically resulting in a charge of $56.70 for each modality they purported to provide.

(x)     HCPCS code G0283, for purported electrical stimulation, typically resulting in a charge of $24.68 for each modality they purported to provide.

193.    As set forth in Exhibit "5", Matos, Blue Sea Rehab, and Machin billed

the "physical therapy" services through Blue Sea Rehab to GEICO under:

(i)     CPT code 97010, for purported hot/cold pack treatments, typically resulting in a charge of $12.65 for each modality they purported to

provide.

(ii)     CPT code 97012, for purported mechanical traction, typically resulting in a charge of $29.58 for each modality they purported to provide.

(iii)    CPT code 97110, for purported therapeutic exercises, typically resulting in a charge of $59.62 for each modality they purported to provide.

(iv)    CPT code 97112, for purported therapeutic neuromuscular reeducation, typically resulting in a charge of $69.00 for each modality they purported to provide.

(v)     CPT code 97530, for purported therapeutic activities, typically resulting in a charge of $76.62 for each modality they purported to provide.

(vi)    HCPCS code G0283, for purported electrical stimulation, typically resulting in a charge of $26.02 for each modality they purported to provide.

194.   In the claims identified in Exhibits "1" - "5", the charges for the purported "physical therapy" services were fraudulent and unlawful in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

195.   In fact, and as set forth herein, the Defendants were never eligible to collect PIP Benefits, inasmuch as the Clinic Defendants operated in violation of Florida law.

196.   In the claims identified in Exhibits "1" - "5", the charges for the purported "physical therapy" services were also fraudulent, unlawful, and ineligible for PIP reimbursement because the services were performed – to the extent that the services were performed at all – by unlicensed and unsupervised individuals, and by massage therapists, including Chabeli Lovagnini Castillo, L.M.T. ("Castillo") and Liliana May Noa, L.M.T. ("Noa") at Primera Health; Raudel Duarte Garcia, L.M.T.

("Duarte Garcia"), Ermelina Rivera Guzman, L.M.T. ("Rivera Guzman"), and Crystal Ward, L.M.T. ("Ward") at Health Clinic Rehab; and Mayerlin Hernandez Trujillo, L.M.T. ("Trujillo") at Tampa Healthcare, none of whom was licensed to practice physical therapy.

197.  Moreover, and in keeping with the fact that the "physical therapy" services in the claims identified in Exhibits "1" - "5" were unlawfully performed by massage therapists and unlicensed/unsupervised individuals, the services were medically unnecessary and were provided – to the extent that the services were provided at all – in a manner that did not comply with legitimate standards of care.

198.  In a legitimate clinical setting, each individual patient's physical therapy treatment schedule, and the specific treatment modalities that will be used as part of that treatment, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

199.  In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed on an ongoing basis as they receive physical therapy.

200.  In keeping with the fact that the "physical therapy" services that were billed to GEICO through the Clinic Defendants were not medically necessary, the Defendants did not tailor the "physical therapy" services that they purported to provide to each Insured's individual circumstances and presentation.

201.  There are many individual types of physical therapy services that

potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

202. However, the Defendants purported to provide substantially similar physical therapy "treatments" to the Insureds in the claims identified in Exhibits "1" - "5" on substantially the same schedule – without regard for the Insureds' individual circumstances.

203. The Defendants were aware of the fact that they could not lawfully recover PIP Benefits for services performed by massage therapists and unlicensed/unsupervised individuals.

204. As a result, and in order to conceal the fact that Castillo, Noa, Duarte Garcia, Rivera Guzman, Ward, Trujillo, and other massage therapists and unlicensed/unsupervised individuals performed the purported "physical therapy" services that were unlawfully billed to GEICO through the Clinic Defendants, the Defendants omitted any reference to Castillo, Noa, Duarte Garcia, Rivera Guzman, Ward, Trujillo, and other massage therapists and unlicensed/unsupervised individuals associated with the Clinic Defendants on the HCFA-1500 forms that they used to bill for the putative "physical therapy" services.

205. Instead, and in the claims for "physical therapy" services identified in Exhibits "1" - "5", the Defendants routinely and falsely listed Matos in Box 31 of the HCFA-1500 forms as the supposed provider or direct supervisor of the purported "physical therapy" services.

206. In fact, Matos – who was simultaneously purporting to perform or

89

directly supervise an impossible number of physical therapy and other services at numerous health care practices at numerous locations on individual dates – did not legitimately perform or directly supervise the "physical therapy" services in the claims identified in Exhibits "1" - "5", and could not have legitimately performed or directly supervised the "physical therapy" services.

207. For example:

(i) On January 24, 2023, Matos purported to personally perform, or at least directly supervise, 73 individual physical therapy and related services to ten individual GEICO insureds at three different locations – (i) Primera Health, located at 8900 N. Armenia Avenue, Suite 102, Tampa, Florida 33604; (ii) Health Clinic Rehab, located at 2512 W. Virginia Avenue, Tampa, Florida 33607; and (iii) Tampa Healthcare, located at 3817 W. Humphrey Street, Suite 202, Tampa, Florida 33614 – constituting approximately 18.25 hours of services for which GEICO received billing under Matos's name and license number on January 24, 2023.

(ii) On February 21, 2023, Matos purported to personally perform, or at least directly supervise, 104 individual physical therapy and related services to sixteen individual GEICO insureds at three different locations – (i) Primera Health, located at 8900 N. Armenia Avenue, Suite 102, Tampa, Florida 33604; (ii) Health Clinic Rehab, located at 2512 W. Virginia Avenue, Tampa, Florida 33607; and (iii) Tampa Healthcare, located at 3817 W. Humphrey Street, Suite 202, Tampa, Florida 33614 – constituting approximately 26 hours of services for which GEICO received billing under Matos's name and license number on February 21, 2023.

(iii) On April 18, 2023, Matos purported to personally perform, or at least directly supervise, 107 individual physical therapy and related services to eight individual GEICO insureds at three different locations – (i) Primera Health, located at 8900 N. Armenia Avenue, Suite 102, Tampa, Florida 33604; (ii) Health Clinic Rehab, located at 2512 W. Virginia Avenue, Tampa, Florida 33607; and (iii) Tampa Healthcare, located at 3817 W. Humphrey Street, Suite 202, Tampa, Florida 33614 – constituting approximately 26.75 hours of services for which GEICO received billing under Matos's name and license number on April 18, 2023.

(iv)    On September 19, 2023, Matos purported to personally perform, or at least directly supervise, 133 individual physical therapy and related services to twenty-one individual GEICO insureds at three different locations – (i) Primera Health, located at 8900 N. Armenia Avenue, Suite 102, Tampa, Florida 33604; (ii) Health Clinic Rehab, located at 2512 W. Virginia Avenue, Tampa, Florida 33607; and (iii) Tampa Healthcare, located at 3817 W. Humphrey Street, Suite 202, Tampa, Florida 33614 – constituting approximately 33.25 hours of services for which GEICO received billing under Matos's name and license number on September 19, 2023.

(v)    On March 7, 2024, Matos purported to personally perform, or at least directly supervise, 84 individual physical therapy and related services to eleven individual GEICO insureds at five different locations – (i) Primera Health, located at 8900 N. Armenia Avenue, Suite 102, Tampa, Florida 33604; (ii) Health Clinic Rehab, located at 2512 W. Virginia Avenue, Tampa, Florida 33607; (iii) Tampa Healthcare, located at 3817 W. Humphrey Street, Suite 202, Tampa, Florida 33614; (iv) Allure Med, located at 215 E. Sligh Avenue, Tampa, Florida 33604; and (v) Blue Sea Rehab, located at 3750 Gunn Highway, Suite 201, Tampa, Florida 33618 – constituting approximately 21 hours of services for which GEICO received billing under Matos's name and license number on March 7, 2024.

(vi)    On April 17, 2024, Matos purported to personally perform, or at least directly supervise, 105 individual physical therapy and related services to twelve individual GEICO insureds at four different locations – (i) Primera Health, located at 8900 N. Armenia Avenue, Suite 102, Tampa, Florida 33604; (ii) Health Clinic Rehab, located at 2512 W. Virginia Avenue, Tampa, Florida 33607; (iii) Tampa Healthcare, located at 3817 W. Humphrey Street, Suite 202, Tampa, Florida 33614; and (iv) Blue Sea Rehab, located at 3750 Gunn Highway, Suite 201, Tampa, Florida 33618 – constituting approximately 26.25 hours of services for which GEICO received billing under Matos's name and license number on April 17, 2024.

(vii)    On June 12, 2024, Matos purported to personally perform, or at least directly supervise, 97 individual physical therapy and related services to ten individual GEICO insureds at four different locations – (i) Primera Health, located at 8900 N. Armenia Avenue, Suite 102, Tampa, Florida 33604; (ii) Health Clinic Rehab, located at 2512 W. Virginia Avenue, Tampa, Florida 33607; (iii) Allure Med, located at 215 E. Sligh Avenue, Tampa, Florida 33604; and (iv) Blue Sea Rehab, located at 3750 Gunn

Highway, Suite 201, Tampa, Florida 33618 – constituting approximately 24.25 hours of services for which GEICO received billing under Matos's name and license number on June 12, 2024.

(viii)   On July 30, 2024, Matos purported to personally perform, or at least directly supervise, 95 individual physical therapy and related services to twelve individual GEICO insureds at five different locations – (i) Primera Health, located at 8900 N. Armenia Avenue, Suite 102, Tampa, Florida 33604; (ii) Health Clinic Rehab, located at 2512 W. Virginia Avenue, Tampa, Florida 33607; (iii) Tampa Healthcare, located at 3817 W. Humphrey Street, Suite 202, Tampa, Florida 33614; (iv) Allure Med, located at 215 E. Sligh Avenue, Tampa, Florida 33604; and (v) Blue Sea Rehab, located at 3750 Gunn Highway, Suite 201, Tampa, Florida 33618 – constituting approximately 23.75 hours of services for which GEICO received billing under Matos's name and license number on July 30, 2024.

(ix)   On August 27, 2024, Matos purported to personally perform, or at least directly supervise, 102 individual physical therapy and related services to thirteen individual GEICO insureds at four different locations – (i) Primera Health, located at 8900 N. Armenia Avenue, Suite 102, Tampa, Florida 33604; (ii) Health Clinic Rehab, located at 2512 W. Virginia Avenue, Tampa, Florida 33607; (iii) Allure Med, located at 215 E. Sligh Avenue, Tampa, Florida 33604; and (iv) Blue Sea Rehab, located at 3750 Gunn Highway, Suite 201, Tampa, Florida 33618 – constituting approximately 25.5 hours of services for which GEICO received billing under Matos's name and license number on August 27, 2024.

(x)   On September 19, 2024, Matos purported to personally perform, or at least directly supervise, 72 individual physical therapy and related services to ten individual GEICO insureds at five different locations – (i) Primera Health, located at 8900 N. Armenia Avenue, Suite 102, Tampa, Florida 33604; (ii) Health Clinic Rehab, located at 2512 W. Virginia Avenue, Tampa, Florida 33607; (iii) Tampa Healthcare, located at 3817 W. Humphrey Street, Suite 202, Tampa, Florida 33614; (iv) Allure Med, located at 215 E. Sligh Avenue, Tampa, Florida 33604; and (v) Blue Sea Rehab, located at 3750 Gunn Highway, Suite 201, Tampa, Florida 33618 – constituting approximately 18 hours of services for which GEICO received billing under Matos's name and license number on September 19, 2024.

(xi)   On January 21, 2025, Matos purported to personally perform, or at least directly supervise, 79 individual physical therapy and related services to

ten individual GEICO insureds at four different locations – (i) Primera Health, located at 8900 N. Armenia Avenue, Suite 102, Tampa, Florida 33604; (ii) Health Clinic Rehab, located at 2512 W. Virginia Avenue, Tampa, Florida 33607; (iii) Allure Med, located at 215 E. Sligh Avenue, Tampa, Florida 33604; and (iv) Blue Sea Rehab, located at 3750 Gunn Highway, Suite 201, Tampa, Florida 33618 – constituting approximately 19.75 hours of services for which GEICO received billing under Matos's name and license number on January 21, 2025.

(xii) On February 25, 2025, Matos purported to personally perform, or at least directly supervise, 123 individual physical therapy and related services to eighteen individual GEICO insureds at five different locations – (i) Primera Health, located at 8900 N. Armenia Avenue, Suite 102, Tampa, Florida 33604; (ii) Health Clinic Rehab, located at 2512 W. Virginia Avenue, Tampa, Florida 33607; (iii) Tampa Healthcare, located at 3817 W. Humphrey Street, Suite 202, Tampa, Florida 33614; (iv) Allure Med, located at 215 E. Sligh Avenue, Tampa, Florida 33604; and (v) Blue Sea Rehab, located at 3750 Gunn Highway, Suite 201, Tampa, Florida 33618 – constituting approximately 30.75 hours of services for which GEICO received billing under Matos's name and license number on February 25, 2025.

(xiii) On March 31, 2025, Matos purported to personally perform, or at least directly supervise, 78 individual physical therapy and related services to eleven individual GEICO insureds at five different locations – (i) Primera Health, located at 8900 N. Armenia Avenue, Suite 102, Tampa, Florida 33604; (ii) Health Clinic Rehab, located at 2512 W. Virginia Avenue, Tampa, Florida 33607; (iii) Tampa Healthcare, located at 3817 W. Humphrey Street, Suite 202, Tampa, Florida 33614; (iv) Allure Med, located at 215 E. Sligh Avenue, Tampa, Florida 33604; and (v) Blue Sea Rehab, located at 3750 Gunn Highway, Suite 201, Tampa, Florida 33618 – constituting approximately 19.5 hours of services for which GEICO received billing under Matos's name and license number on March 31, 2025.

(xiv) On April 16, 2025, Matos purported to personally perform, or at least directly supervise, 102 individual physical therapy and related services to sixteen individual GEICO insureds at five different locations – (i) Primera Health, located at 8900 N. Armenia Avenue, Suite 102, Tampa, Florida 33604; (ii) Health Clinic Rehab, located at 2512 W. Virginia Avenue, Tampa, Florida 33607; (iii) Tampa Healthcare, located at 3817 W. Humphrey Street, Suite 202, Tampa, Florida 33614; (iv) Allure Med, located at 215 E. Sligh Avenue, Tampa, Florida 33604; and (v) Blue Sea

Rehab, located at 3750 Gunn Highway, Suite 201, Tampa, Florida 33618 – constituting approximately 25.5 hours of services for which GEICO received billing under Matos's name and license number on April 16, 2025.

(xv) On May 5, 2025, Matos purported to personally perform, or at least directly supervise, 71 individual physical therapy and related services to nine individual GEICO insureds at four different locations – (i) Primera Health, located at 8900 N. Armenia Avenue, Suite 102, Tampa, Florida 33604; (ii) Health Clinic Rehab, located at 2512 W. Virginia Avenue, Tampa, Florida 33607; (iii) Allure Med, located at 215 E. Sligh Avenue, Tampa, Florida 33604; and (iv) Blue Sea Rehab, located at 3750 Gunn Highway, Suite 201, Tampa, Florida 33618 – constituting approximately 17.75 hours of services for which GEICO received billing under Matos's name and license number on May 5, 2025.

208. These are only representative examples. In the claims for Fraudulent Services identified in Exhibits "1" - "5", the Defendants routinely and falsely represented that Matos had performed – or at least directly supervised – an impossible amount of services on individual dates.

209. Furthermore, upon information and belief, the fraudulent billing that the Defendants submitted to GEICO constituted only a fraction of the total fraudulent billing for Fraudulent Services that the Defendants submitted to all of the automobile insurers in the Florida automobile insurance market.

210. GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

211. It is highly improbable that the Defendants only submitted fraudulent billing to GEICO alone, and that the Defendants did not simultaneously bill other automobile insurers.

212. Thus, upon information and belief, the impossible amount of Fraudulent

Services that Matos purported to perform or directly supervise for GEICO insureds, on individual dates of service – including but not limited to the dates of service identified above – constituted only a fraction of the total amount of Fraudulent Services that Matos purported to perform or directly supervise on those same dates of service.

213.   In the claims for "physical therapy" services identified in Exhibits "1" - "5", the Defendants routinely and falsely misrepresented that the "physical therapy" services were lawfully provided and reimbursable, when, in fact, the "physical therapy" services were neither lawfully provided nor reimbursable, because:

(i)     the purported "physical therapy" services were performed – to the extent that the "physical therapy" services were performed at all – by massage therapists and unlicensed/unsupervised individuals, in contravention of Florida law;

(ii)    the Defendants could not lawfully recover PIP Benefits for the purported "physical therapy" services, because the "physical therapy" services were performed by massage therapists and unlicensed/unsupervised individuals; and

(iii)   the Defendants systematically and fraudulently misrepresented and concealed the identities of the individuals who either personally performed or directly supervised the putative "physical therapy" services.

214.   In this context, Matos, who – at all relevant times – purported to serve as medical director at each of the Clinic Defendants, did not legitimately perform the required duties of a clinic medical director at any of the Clinic Defendants.

215.   Had Matos actually performed his duties as medical director, he would have noted – among other things – that the "physical therapy" services administered at the Clinic Defendants' offices were medically unnecessary, unlawfully provided by

massage therapists and/or unlicensed/unsupervised individuals, and unlawfully billed to GEICO.

216.   In this context, Carreras and King, who purported to serve as medical directors at Primera Health, did not legitimately perform the required duties of clinic medical directors at Primera Health.

217.   Had Carreras and King actually performed theirs duties as medical directors, they would have noted – among other things – that the "physical therapy" services administered at Primera Health's offices were medically unnecessary, unlawfully provided by massage therapists and/or unlicensed/unsupervised individuals, and unlawfully billed to GEICO.

**E.    The Fraudulent and Unlawful Charges for Extracorporeal Shockwave Therapy at Primera Health, Health Clinic Rehab, and Tampa Healthcare**

218.   Based on the false, boilerplate "diagnoses" that the Examination Defendants provided during the initial and follow-up examinations, Matos, Primera Health, Izaguirre, Health Clinic Rehab, Sosa, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus also purported to subject many of the Insureds in the claims identified in Exhibits "1" - "3" to one or more sessions of ESWT during the course of their fraudulent treatment protocols.

219.   As set forth in Exhibit "1", Matos, Primera Health, and Izaguirre billed the ESWT through Primera Health to GEICO under CPT code 0101T, typically resulting in a charge of $489.00 for each ESWT treatment they purported to provide.

220.   As set forth in Exhibit "2", Matos, Health Clinic Rehab, and Sosa billed

the ESWT through Health Clinic Rehab to GEICO under CPT code 0101T, typically resulting in a charge of $625.00 for each ESWT treatment they purported to provide.

221.   As set forth in Exhibit "3", Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed the ESWT through Tampa Healthcare to GEICO under CPT code 0101T, typically resulting in a charge of $800.00 for each ESWT treatment they purported to provide.

222.   Like the charges for the other Fraudulent Services, the charges for ESWT were fraudulent in that the ESWT was medically unnecessary and was provided – to the extent that it was provided at all – pursuant to false, boilerplate "diagnoses" that the Examination Defendants provided during their fraudulent examinations.

223.   In keeping with the fact that the ESWT "treatments" were medically unnecessary: (i) ESWT has not been approved by the U.S. Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain; (ii) Palmetto, a contractor for CMS, has published coverage guidance stating that ESWT is neither reasonable nor necessary for the treatment of musculoskeletal conditions; and (iii) there are no legitimate peer-reviewed data that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain.

224.   Even so, Matos, Primera Health, Izaguirre, Health Clinic Rehab, Sosa, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus purported to provide medically unnecessary ESWT to many Insureds pursuant to their pre-determined fraudulent treatment protocols, without regard for each Insured's individual complaints, symptoms, or presentation.

225. For example:

(i) On April 11, 2024, an Insured named NM was involved in an automobile accident. Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus then purported to administer three different ESWT treatments to NM between June 27, 2024, and July 11, 2024. Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the ESWT treatments under CPT code 0101T.

(ii) On June 11, 2024, an Insured named JS was involved in an automobile accident. Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus then purported to administer five different ESWT treatments to JS between June 28, 2024, and August 1, 2024. Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the ESWT treatments under CPT code 0101T.

(iii) On September 16, 2024, an Insured named KL was involved in an automobile accident. Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus then purported to administer three different ESWT treatments to KL between October 1, 2024, and November 4, 2024. Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the ESWT treatments under CPT code 0101T.

(iv) On October 8, 2024, an Insured named DC was involved in an automobile accident. Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus then purported to administer three different ESWT treatments to DC between October 22, 2024, and November 5, 2024. Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the ESWT treatments under CPT code 0101T.

(v) On October 24, 2024, an Insured named BP was involved in an automobile accident. Matos, Health Clinic Rehab, and Sosa then purported to administer four different ESWT treatments to BP between January 22, 2025, and February 3, 2025. Matos, Health Clinic Rehab, and Sosa billed GEICO for the ESWT treatments under CPT code 0101T.

(vi) On December 4, 2024, an Insured named MV was involved in an automobile accident. Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus then purported to administer two different ESWT treatments to MV between January 9, 2025, and January 15, 2025. Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO for the ESWT treatments under CPT code 0101T.

(vii)  On December 20, 2024, an Insured named AS was involved in an automobile accident. Matos, Health Clinic Rehab, and Sosa then purported to administer four different ESWT treatments to AS between January 23, 2025, and February 10, 2025. Matos, Health Clinic Rehab, and Sosa billed GEICO for the ESWT treatments under CPT code 0101T.

(viii)  On February 11, 2025, an Insured named JM was involved in an automobile accident. Matos, Primera Health, and Izaguirre then purported to administer three different ESWT treatments to JM between March 5, 2025, and April 11, 2025. Matos, Primera Health, and Izaguirre billed GEICO for the ESWT treatments under CPT code 0101T.

(ix)  On February 14, 2025, an Insured named DG was involved in an automobile accident. Matos, Health Clinic Rehab, and Sosa then purported to administer twelve different ESWT treatments to DG between February 20, 2025, and April 1, 2025. Matos, Health Clinic Rehab, and Sosa billed GEICO for the ESWT treatments under CPT code 0101T.

(x)  On February 20, 2025, an Insured named MP was involved in an automobile accident. Matos, Health Clinic Rehab, and Sosa then purported to administer ten different ESWT treatments to MP between March 6, 2025, and April 22, 2025. Matos, Health Clinic Rehab, and Sosa billed GEICO for the ESWT treatments under CPT code 0101T.

(xi)  On March 4, 2025, an Insured named JR was involved in an automobile accident. Matos, Primera Health, and Izaguirre then purported to administer two different ESWT treatments to JR between March 17, 2025, and March 20, 2025. Matos, Primera Health, and Izaguirre billed GEICO for the ESWT treatments under CPT code 0101T.

(xii)  On March 17, 2025, an Insured named CK was involved in an automobile accident. Matos, Primera Health, and Izaguirre then purported to administer two different ESWT treatments to CK between March 20, 2025, and April 8, 2025. Matos, Primera Health, and Izaguirre billed GEICO for the ESWT treatments under CPT code 0101T.

(xiii)  On March 29, 2025, an Insured named RP was involved in an automobile accident. Matos, Primera Health, and Izaguirre then purported to administer four different ESWT treatments to RP between April 9, 2025, and May 20, 2025. Matos, Primera Health, and Izaguirre

billed GEICO for the ESWT treatments under CPT code 0101T.

(xiv)    On April 3, 2025, an Insured named TV was involved in an automobile accident. Matos, Health Clinic Rehab, and Sosa then purported to administer seven different ESWT treatments to TV between April 10, 2025, and June 9, 2025. Matos, Health Clinic Rehab, and Sosa billed GEICO for the ESWT treatments under CPT code 0101T.

(xv)    On April 17, 2025, an Insured named OP was involved in an automobile accident. Matos, Primera Health, and Izaguirre then purported to administer three different ESWT treatments to OP between April 25, 2025, and July, 2025. Matos, Primera Health, and Izaguirre billed GEICO for the ESWT treatments under CPT code 0101T.

226.    These are only representative examples. In the claims for ESWT identified in Exhibits "1" - "3", Matos, Primera Health, Izaguirre, Health Clinic Rehab, Sosa, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus routinely billed GEICO for medically unnecessary ESWT that purportedly was provided to the Insureds through Primera Health, Health Clinic Rehab, and Tampa Healthcare.

227.    In this context, Matos, who – at all relevant times – purported to serve as medical director at each of the Clinic Defendants, did not legitimately perform the required duties of a clinic medical director at any of the Clinic Defendants.

228.    Had Matos actually performed his duties as medical director, he would not have permitted Primera Health, Health Clinic Rehab, and Tampa Healthcare to bill for the medically unnecessary ESWT treatments that were unlawfully performed and billed to GEICO.

**F.     The Fraudulent and Unlawful Charges for PENS Treatments and Implantable Neurostimulator Electrodes at Primera Health**

229.    Pursuant to the boilerplate diagnoses that they provided to virtually every Insured at the conclusion of their purported examinations, Matos, Primera Health, Izaguirre, Carreras, and King purported to provide many Insureds with a large number of medically unnecessary PENS treatments and implantable neurostimulator electrodes.

230.    As set forth in Exhibit "1", Matos, Primera Health, Izaguirre, Carreras, and King billed the PENS treatments through Primera Health to GEICO under CPT code 64999, typically resulting in a charge of $400.00 for each PENS treatment they purported to provide.

231.    Additionally, and as set forth in Exhibit "1", Matos, Primera Health, Izaguirre, Carreras, and King billed the implantable neurostimulator electrodes through Primera Health to GEICO under HCPCS code L8680, typically resulting in a charge of $1,000.00 for each implantable neurostimulator electrode they purported to provide.

232.    Like all the other Fraudulent Services that Matos, Primera Health, Izaguirre, Carreras, and King purported to provide, the charges for the PENS treatments and implantable neurostimulator electrodes were fraudulent in that they falsely represented that Primera Health was entitled to receive PIP Benefits in the first instance, when, in fact, Primera Health was not entitled to receive PIP Benefits because it operated in violation of Florida law.

233. The charges for the PENS treatments and implantable neurostimulator electrodes were also fraudulent in that the treatments and equipment were medically unnecessary and were provided – to the extent that the treatments and equipment were provided at all – pursuant to Matos, Primera Health, Izaguirre, Carreras, and King's pre-determined fraudulent treatment protocols.

234. In a legitimate clinical setting, PENS is a procedure that combines the features of electro-acupuncture and transcutaneous nerve stimulation, whereby electrical current is applied through the skin to provide patients with pain control. PENS treatments are administered through fine needle-like electrodes that are placed in close proximity to the patient's painful areas and are then used to stimulate peripheral sensory nerves in the soft tissue.

235. According to guidelines published by CMS, if pain is effectively controlled through PENS treatments, then implantation of electrodes is warranted.

236. CMS further instructs that physicians should generally be able to determine whether a patient is likely to derive a significant therapeutic benefit from the continued use of implanted electrodes within a one-month trial period.

237. Moreover, CMS instructs that a patient can be taught how to utilize implanted electrodes and, once this is accomplished, the patient can use the electrodes safely and effectively without physician supervision. Consequently, it is inappropriate for a patient to visit a physician, physical therapist, or outpatient clinic on a continuing basis for the treatment of pain with PENS treatments.

238. Even so, Matos, Primera Health, Izaguirre, Carreras, and King routinely

purported to provide large numbers of medically unnecessary PENS treatments and implantable neurostimulator electrodes to Insureds on an outpatient basis, in order to maximize the amount of fraudulent and unlawful billing that they could submit to GEICO and other insurers.

239.    Moreover, to the extent that Matos, Primera Health, Izaguirre, Carreras, and King actually provided any electrical stimulation treatments to Insureds in the first instance, the treatments consisted of ordinary electrical stimulation, not legitimate PENS treatments or implantable neurostimulator electrodes.

240.    Ordinary electrical stimulation treatments are billable at a much lower rate than legitimate PENS treatments and implantable neurostimulator electrodes.

241.    Matos, Primera Health, Izaguirre, Carreras, and King deliberately misrepresented the nature of the electrical stimulation treatments they purported to provide and instead billed the treatments as PENS treatments and implantable neurostimulator electrodes in a calculated attempt to overcharge GEICO for the ordinary electrical stimulation treatments.

## G.    The Fraudulent and Unlawful Charges for Home Medical Equipment at Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab

242.    As part of their fraudulent and unlawful schemes, Matos, Primera Health, Izaguirre, Carreras, King, Health Clinic Rehab, Sosa, Tampa Healthcare, Gonzalez-Torres, Garcia de Jesus, Blue Sea Rehab, and Machin purported to provide many Insureds with HME, including rigid lower back braces known as lumbar-sacral orthoses ("LSO").

243.    As set forth in Exhibit "1", Matos, Primera Health, Izaguirre, Carreras, and King billed the HME through Primera Health to GEICO under:

(i)    HCPCS code L0631, for purported custom-fitted LSOs with sagittal control, rigid anterior, and posterior panels, typically resulting in a charge of $1,975.00 for each LSO they purported to provide.

(ii)   HCPCS code L0637, for purported custom-fitted LSOs with sagittal-coronal control, rigid anterior, and posterior frame/panels, typically resulting in a charge of $2,627.98 for each LSO they purported to provide.

244.    As set forth in Exhibit "2", Matos, Health Clinic Rehab, and Sosa billed the HME through Health Clinic Rehab to GEICO under HCPCS code L0637, for purported custom-fitted LSOs with sagittal-coronal control, rigid anterior, and posterior frame/panels, typically resulting in a charge of $2,627.98 for each LSO they purported to provide.

245.    As set forth in Exhibit "3", Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed the HME through Tampa Healthcare to GEICO under HCPCS code L0637, for purported custom-fitted LSOs with sagittal-coronal control, rigid anterior, and posterior frame/panels, typically resulting in a charge of $2,620.02 for each LSO they purported to provide.

246.    As set forth in Exhibit "5", Matos, Blue Sea Rehab, and Machin billed the HME through Blue Sea Rehab to GEICO under HCPCS code L0627, for purported custom-fitted LOs with sagittal-coronal control, rigid anterior, and posterior panels, typically resulting in a charge of $972.60 for each LO they purported to provide.

247.    Like the Defendants' charges for the other Fraudulent Services, the

charges for HME were fraudulent in that they misrepresented Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab's eligibility to collect PIP Benefits in the first instance.

248.   In fact, and as set forth herein, Matos, Primera Health, Izaguirre, Carreras, King, Health Clinic Rehab, Sosa, Tampa Healthcare, Gonzalez-Torres, Garcia de Jesus, Blue Sea Rehab, and Machin were never eligible to collect PIP Benefits, inasmuch as Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab operated in violation of Florida law.

249.   Moreover, Matos, Primera Health, Izaguirre, Carreras, King, Health Clinic Rehab, Sosa, Tampa Healthcare, Gonzalez-Torres, Garcia de Jesus, Blue Sea Rehab, and Machin's charges for the HME identified in Exhibits "1" - "3" and "5" were also fraudulent in that they misrepresented the medical necessity of the HME – and, in particular, the medical necessity of rigid LSOs.

250.   A rigid LSO is a custom-fitted lower back brace designed to restrict the movement of a patient's torso and support the patient's lumbar spine. Because of its rigidity and required placement on a patient's lower back, a rigid LSO must be custom-fitted in order for it to be properly utilized by the patient.

251.   In a legitimate clinical setting, a rigid LSO is reserved for patients who exhibit spinal instability or for patients who have recently undergone spinal surgery.

252.   Because a rigid LSO is designed to limit the range of motion of a patient's lumbar spine, its prescription is inconsistent with the goals of treatment designed to restore and increase range of motion and functionality of the lumbar spine.

253.    Along similar lines, the prescription and use of a rigid LSO would be counterproductive to the goals of physical therapy treatment modalities, which seek to restore movement and functionality to the lumbar spine.

254.    In fact, the medically unnecessary prescription of a rigid LSO – and the resulting immobilization of the lumbar spine – may put a patient at considerable risk of weakening of the muscles or even atrophy of the muscles in the lower back.

255.    Moreover, in a legitimate clinical setting, a rigid LSO should not be prescribed before the patient has first attempted and failed a legitimate course of conservative treatment, and it should not simultaneously be prescribed with conservative treatment such as physical therapy.

256.    The Insureds in the claims identified in Exhibits "1" - "3" and "5" did not suffer from spinal instability. In fact, virtually none of the Insureds in the claims identified in Exhibits "1" - "3" and "5" suffered any serious injuries at all as the result of their minor automobile accidents, much less health problems requiring spinal surgery and subsequent immobilization of their spine.

257.    The Insureds in the claims identified in Exhibits "1" - "3" and "5" generally had not attempted and failed a legitimate course of conservative treatment prior to their receipt of a prescription for a rigid LSO.

258.    Even so, Matos, Primera Health, Izaguirre, Carreras, King, Health Clinic Rehab, Sosa, Tampa Healthcare, Gonzalez-Torres, Garcia de Jesus, Blue Sea Rehab, and Machin routinely purported to provide medically unnecessary LSOs to the Insureds in the claims identified in Exhibits "1" - "3" and "5", despite the fact that:

(i)     the Insureds did not suffer from spinal instability and were not recovering from spinal surgery;

(ii)    the Defendants did not measure or fit the devices for the Insureds;

(iii)   the Insureds had not yet failed any legitimate course of conservative treatment, and, in fact, were often prescribed the LSOs within days of their typically minor automobile accidents; and

(iv)    the Insureds were often concomitantly prescribed a course of physical therapy that was administered at Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab's offices, the supposed purpose of which was to restore the range of motion and functionality of – among other things – the Insureds' lumbar spines, and the use of a rigid LSO would be counterproductive to this goal.

259.    For example:

(i)     On January 28, 2020, an insured named MV was involved in an automobile accident. On January 30, 2020, MV presented to Primera Health for an initial examination. MV was immediately prescribed a course of physical therapy, which MV underwent at Primera Health between January 31, 2020, and March 12, 2020. Nevertheless, MV was also prescribed medically unnecessary HME, despite the fact that MV: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Primera Health, the putative purpose of which was to increase, rather than decrease, MV's range of motion. Primera Health, Izaguirre, and Silva billed GEICO under HCPCS codes L0631 and L0180, seeking reimbursement of $1,975.00 and $668.72, respectively, for the medically unnecessary HME.

(ii)    On October 28, 2021, an insured named LC was involved in an automobile accident. On October 30, 2021, LC presented to Primera Health for an initial examination. LC was immediately prescribed a course of physical therapy, which LC underwent at Primera Health between November 1, 2021, and December 9, 2021. Nevertheless, LC was also prescribed medically unnecessary HME, despite the fact that LC: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was

concomitantly undergoing the above-described course of physical therapy at Primera Health, the putative purpose of which was to increase, rather than decrease, LC's range of motion. Primera Health, Izaguirre, and Carreras billed GEICO under HCPCS codes L0637 and L0180, seeking reimbursement of $2,627.98 and $668.72, respectively, for the medically unnecessary HME.

(iii)   On March 10, 2022, an insured named LS was involved in an automobile accident. On March 11, 2022, LS presented to Primera Health for an initial examination. LS was immediately prescribed a course of physical therapy, which LS underwent at Primera Health between March 14, 2022, and June 15, 2022. Nevertheless, LS was also prescribed medically unnecessary HME, despite the fact that LS: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Primera Health, the putative purpose of which was to increase, rather than decrease, LS's range of motion. Primera Health, Izaguirre, and Carreras billed GEICO under HCPCS codes L0637 and L0180, seeking reimbursement of $2,627.98 and $668.72, respectively, for the medically unnecessary HME.

(iv)   On January 16, 2023, an insured named AE was involved in an automobile accident. On January 18, 2023, AE presented to Health Clinic Rehab for an initial examination. AE was immediately prescribed a course of physical therapy, which AE underwent at Health Clinic Rehab between January 18, 2023, and February 28, 2023. Nevertheless, AE was also prescribed medically unnecessary HME, despite the fact that AE: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health Clinic Rehab, the putative purpose of which was to increase, rather than decrease, AE's range of motion. Matos, Health Clinic Rehab, and Sosa billed GEICO under HCPCS codes L0637 and L0180, seeking reimbursement of $2,627.98 and $670.70, respectively, for the medically unnecessary HME.

(v)   On March 19, 2023, an insured named NC was involved in an automobile accident. On April 1, 2023, NC presented to Tampa Healthcare for an initial examination. NC was immediately prescribed a course of physical therapy, which NC underwent at Tampa Healthcare

between April 4, 2023, and July 28, 2023. Nevertheless, NC was also prescribed medically unnecessary HME, despite the fact that NC: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Tampa Healthcare, the putative purpose of which was to increase, rather than decrease, NC's range of motion. Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO under HCPCS code L0637, seeking reimbursement of $2,620.02 for the medically unnecessary HME.

(vi)    On May 14, 2023, an insured named MM was involved in an automobile accident. On May 20, 2023, MM presented to Primera Health for an initial examination. MM was immediately prescribed a course of physical therapy, which MM underwent at Primera Health between June 6, 2023, and July 24, 2023. Nevertheless, MM was also prescribed medically unnecessary HME, despite the fact that MM: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Primera Health, the putative purpose of which was to increase, rather than decrease, MM's range of motion. Matos, Primera Health, and Izaguirre billed GEICO under HCPCS codes L0637 and L0180, seeking reimbursement of $2,627.98 and $668.72, respectively, for the medically unnecessary HME.

(vii)    On November 6, 2023, an insured named MR was involved in an automobile accident. On November 7, 2023, MR presented to Health Clinic Rehab for an initial examination. MR was immediately prescribed a course of physical therapy, which MR underwent at Health Clinic Rehab between November 7, 2023, and March 18, 2024. Nevertheless, MR was also prescribed medically unnecessary HME, despite the fact that MR: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health Clinic Rehab, the putative purpose of which was to increase, rather than decrease, MR's range of motion. Matos, Health Clinic Rehab, and Sosa billed GEICO under HCPCS codes L0637 and L0180, seeking reimbursement of $2,627.98 and $670.70, respectively, for the medically unnecessary HME.

(viii)   On March 27, 2024, an insured named JR was involved in an automobile accident. On March 29, 2024, JR presented to Blue Sea Rehab for an initial examination. JR was immediately prescribed a course of physical therapy, which JR underwent at Blue Sea Rehab between March 29, 2024, and May 24, 2024. Nevertheless, JR was also prescribed medically unnecessary HME, despite the fact that JR: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Blue Sea Rehab, the putative purpose of which was to increase, rather than decrease, JR's range of motion. Matos, Blue Sea Rehab, and Machin billed GEICO under HCPCS codes L0637 and L0180, seeking reimbursement of $3,220.94 and $822.04, respectively, for the medically unnecessary HME.

(ix)   On June 13, 2024, an insured named EP was involved in an automobile accident. On June 14, 2024, EP presented to Tampa Healthcare for an initial examination. EP was immediately prescribed a course of physical therapy, which EP underwent at Tampa Healthcare between June 14, 2024, and September 24, 2024. Nevertheless, EP was also prescribed medically unnecessary HME, despite the fact that EP: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Tampa Healthcare, the putative purpose of which was to increase, rather than decrease, EP's range of motion. Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO under HCPCS code L0637, seeking reimbursement of $2,620.02 for the medically unnecessary HME.

(x)   On August 21, 2024, an insured named EI was involved in an automobile accident. On August 22, 2024, EI presented to Health Clinic Rehab for an initial examination. EI was immediately prescribed a course of physical therapy, which EI underwent at Health Clinic Rehab between August 22, 2024, and September 4, 2024. Nevertheless, EI was also prescribed medically unnecessary HME, despite the fact that EI: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health Clinic Rehab, the putative purpose of which was to

increase, rather than decrease, EI's range of motion. Matos, Health Clinic Rehab, and Sosa billed GEICO under HCPCS codes L0637 and L0180, seeking reimbursement of $2,627.98 and $670.70, respectively, for the medically unnecessary HME.

(xi)    On August 31, 2024, an insured named GT was involved in an automobile accident. On September 4, 2024, GT presented to Primera Health for an initial examination. GT was immediately prescribed a course of physical therapy, which GT underwent at Primera Health between September 6, 2024, and October 25, 2024. Nevertheless, GT was also prescribed medically unnecessary HME, despite the fact that GT: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Primera Health, the putative purpose of which was to increase, rather than decrease, GT's range of motion. Matos, Primera Health, and Izaguirre billed GEICO under HCPCS codes L0637 and L0180, seeking reimbursement of $2,627.98 and $668.72, respectively, for the medically unnecessary HME.

(xii)   On November 8, 2024, an insured named RV was involved in an automobile accident. On November 12, 2024, RV presented to Tampa Healthcare for an initial examination. RV was immediately prescribed a course of physical therapy, which RV underwent at Tampa Healthcare between November 12, 2024, and January 15, 2025. Nevertheless, RV was also prescribed medically unnecessary HME, despite the fact that RV: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Tampa Healthcare, the putative purpose of which was to increase, rather than decrease, RV's range of motion. Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO under HCPCS code L0637, seeking reimbursement of $2,620.02 for the medically unnecessary HME.

(xiii)  On January 12, 2025, an insured named OM was involved in an automobile accident. On January 15, 2025, OM presented to Blue Sea Rehab for an initial examination. OM was immediately prescribed a course of physical therapy, which OM underwent at Blue Sea Rehab between January 15, 2025, and March 6, 2025. Nevertheless, OM was also prescribed medically unnecessary HME, despite the fact that OM:

(a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Blue Sea Rehab, the putative purpose of which was to increase, rather than decrease, OM's range of motion. Matos, Blue Sea Rehab, and Machin billed GEICO under HCPCS codes L0637 and L0180, seeking reimbursement of $3,220.94 and $822.04, respectively, for the medically unnecessary HME.

(xiv)   On February 10, 2025, an insured named WB was involved in an automobile accident. On February 13, 2025, WB presented to Health Clinic Rehab for an initial examination. WB was immediately prescribed a course of physical therapy, which WB underwent at Health Clinic Rehab between February 13, 2025, and March 27, 2025. Nevertheless, WB was also prescribed medically unnecessary HME, despite the fact that WB: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health Clinic Rehab, the putative purpose of which was to increase, rather than decrease, WB's range of motion. Matos, Health Clinic Rehab, and Sosa billed GEICO under HCPCS codes L0637 and L0180, seeking reimbursement of $2,627.98 and $670.70, respectively, for the medically unnecessary HME.

(xv)   On February 12, 2025, an insured named AV was involved in an automobile accident. On February 13, 2025, AV presented to Tampa Healthcare for an initial examination. AV was immediately prescribed a course of physical therapy, which AV underwent at Tampa Healthcare between February 13, 2025, and April 16, 2025. Nevertheless, AV was also prescribed medically unnecessary HME, despite the fact that AV: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Tampa Healthcare, the putative purpose of which was to increase, rather than decrease, AV's range of motion. Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO under HCPCS code L0637, seeking reimbursement of $2,620.02 for the medically unnecessary HME.

(xvi)   On April 6, 2025, an insured named AA was involved in an automobile

accident. On April 8, 2025, AA presented to Blue Sea Rehab for an initial examination. AA was immediately prescribed a course of physical therapy, which AA underwent at Blue Sea Rehab between April 8, 2025, and June 3, 2025. Nevertheless, AA was also prescribed medically unnecessary HME, despite the fact that AA: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Blue Sea Rehab, the putative purpose of which was to increase, rather than decrease, AA's range of motion. Matos, Blue Sea Rehab, and Machin billed GEICO under HCPCS codes L0637 and L0180, seeking reimbursement of $3,220.94 and $822.04, respectively, for the medically unnecessary HME.

(xvii) On May 12, 2025, an insured named AF was involved in an automobile accident. On May 14, 2025, AF presented to Health Clinic Rehab for an initial examination. AF was immediately prescribed a course of physical therapy, which AF underwent at Health Clinic Rehab between May 14, 2025, and June 12, 2025. Nevertheless, AF was also prescribed medically unnecessary HME, despite the fact that AF: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health Clinic Rehab, the putative purpose of which was to increase, rather than decrease, AF's range of motion. Matos, Health Clinic Rehab, and Sosa billed GEICO under HCPCS codes L0637 and L0180, seeking reimbursement of $2,627.98 and $670.70, respectively, for the medically unnecessary HME.

(xviii) On May 31, 2025, an insured named ED was involved in an automobile accident. On June 2, 2025, ED presented to Blue Sea Rehab for an initial examination. ED was immediately prescribed a course of physical therapy, which ED underwent at Blue Sea Rehab between June 2, 2025, and August 1, 2025. Nevertheless, ED was also prescribed medically unnecessary HME, despite the fact that ED: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Blue Sea Rehab, the putative purpose of which was to increase, rather than decrease, ED's range of motion. Matos, Blue Sea Rehab, and Machin billed GEICO

under HCPCS codes L0637 and L0180, seeking reimbursement of $3,220.94 and $822.04, respectively, for the medically unnecessary HME.

(xix) On June 7, 2025, an insured named NM was involved in an automobile accident. On June 9, 2025, NM presented to Tampa Healthcare for an initial examination. NM was immediately prescribed a course of physical therapy, which NM underwent at Tampa Healthcare between June 9, 2025, and July 10, 2025. Nevertheless, NM was also prescribed medically unnecessary HME, despite the fact that NM: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Tampa Healthcare, the putative purpose of which was to increase, rather than decrease, NM's range of motion. Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus billed GEICO under HCPCS code L0637, seeking reimbursement of $2,620.02 for the medically unnecessary HME.

(xx) On July 14, 2025, an insured named JB was involved in an automobile accident. On July 15, 2025, JB presented to Blue Sea Rehab for an initial examination. JB was immediately prescribed a course of physical therapy, which JB underwent at Blue Sea Rehab between July 15, 2025, and August 1, 2025. Nevertheless, JB was also prescribed medically unnecessary HME, despite the fact that JB: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Blue Sea Rehab, the putative purpose of which was to increase, rather than decrease, JB's range of motion. Matos, Blue Sea Rehab, and Machin billed GEICO under HCPCS codes L0637 and L0180, seeking reimbursement of $3,220.94 and $822.04, respectively, for the medically unnecessary HME.

260. These are only representative examples. In almost all of the claims for HME identified in Exhibits "1" - "3" and "5", Matos, Primera Health, Izaguirre, Carreras, King, Health Clinic Rehab, Sosa, Tampa Healthcare, Gonzalez-Torres, Garcia de Jesus, Blue Sea Rehab, and Machin falsely represented that the prescribed

114

HME was medically necessary, when, in fact, it was not.

261.   In this context, Matos, who – at all relevant times – purported to serve as medical director at each of the Clinic Defendants, did not legitimately perform the required duties of a clinic medical director at any of the Clinic Defendants.

262.   Had Matos actually performed his duties as medical director, he would not have permitted Primera Health, Health Clinic Rehab, Tampa Healthcare, and Blue Sea Rehab to bill for the medically unnecessary HME that was unlawfully provided to the Insureds and then unlawfully billed to GEICO.

263.   In this context, Carreras and King, who purported to serve as medical directors at Primera Health, did not legitimately perform the required duties of clinic medical directors at Primera Health.

264.   Had Carreras and King actually performed their duties as medical directors, they would not have permitted Primera Health to bill for the medically unnecessary HME that was unlawfully provided to the Insureds and then unlawfully billed to GEICO.

**H.    The Defendants' Violations of the False and Fraudulent Insurance Claims Statute**

265.   The Defendants knew that, if they made a legitimate, good-faith effort to collect deductibles from their patients, it would impede their ability to carry out the fraudulent and unlawful schemes described herein. For instance, if the Defendants made legitimate efforts to collect deductibles, Insureds would be less likely to continue presenting to the Clinic Defendants' offices for medically unnecessary treatment.

266.    Accordingly, as part and parcel of their fraudulent and unlawful schemes, the Defendants unlawfully engaged in the general business practice of waiving – or failing to make a good-faith effort to collect – PIP deductibles from their patients, in violation of the False and Fraudulent Insurance Claims Statute.

267.    In keeping with this fact, in almost all of the thousands of bills (i.e., HCFA-1500 forms) submitted to GEICO through the Clinic Defendants, the Defendants represented that they did not collect any money, whether it be a co-payment or a deductible, from the Insureds.

268.    In the claims identified in Exhibits "1" - "5", the Defendants routinely and falsely represented that the underlying health care services were lawfully provided and reimbursable, when, in fact, the health care services were neither lawfully provided nor reimbursable, because the Defendants operated in violation of the False and Fraudulent Insurance Claims Statute.

## III.    The Fraudulent Claims the Defendants Submitted to GEICO

269.    To support their fraudulent charges, the Defendants systematically submitted thousands of bills and treatment reports – containing thousands of individual charges – to GEICO through the respective Clinic Defendants, seeking payment for Fraudulent Services that the Defendants were not entitled to receive.

270.    The claims that the Defendants submitted to GEICO were false and misleading in the following material respects:

(i)    The bills and treatment reports submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with Florida law and were, therefore, eligible to collect PIP Benefits in the first

instance, when, in fact, the Defendants were not in compliance with Florida law and were not eligible to collect PIP Benefits in the first instance.

(ii)    The bills and treatment reports submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided, lawfully billed to GEICO, and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided, not lawfully billed to GEICO, and not eligible for PIP reimbursement.

(iii)   The bills and treatment reports submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary, and, in many cases, misrepresented to GEICO that the Fraudulent Services were actually performed. In fact, the Fraudulent Services frequently were not performed at all, and – to the extent that the Fraudulent Services were performed – the Fraudulent Services were not medically necessary and were performed as part of pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, and not to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

(iv)    The bills and treatment reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the level and nature of the Fraudulent Services that purportedly were provided.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

271.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

272.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and have gone to great lengths to accomplish this concealment.

273.    For instance, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Defendants operated in

violation of Florida law and were, therefore, ineligible to collect PIP Benefits in the first instance.

274.    The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary, and frequently, never even performed in the first instance.

275.    The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were oftentimes unlawfully performed by massage therapists and unlicensed/unsupervised individuals, and then unlawfully billed to GEICO.

276.    GEICO is under statutory and contractual duty to promptly and fairly process claims within thirty (30) days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to cause – and did cause – GEICO to rely on them. As a result, GEICO has incurred damages of more than $2,891,000.00.

277.    GEICO did not discover – and could not reasonably have discovered – that its damages were attributable to fraud until shortly before it commenced this action.

## FIRST CAUSE OF ACTION
### Against Primera Health, Health Clinic Rehab,
### Tampa Healthcare, Allure Med, and Blue Sea Rehab
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

278.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

279.   There is an actual case in controversy between GEICO and Primera Health, Health Clinic Rehab, Tampa Healthcare, Allure Med, and Blue Sea Rehab regarding more than $75,000.00 in fraudulent and unlawful pending billing that has been submitted to GEICO in the name of Primera Health, Health Clinic Rehab, Tampa Healthcare, Allure Med, and Blue Sea Rehab.

280.   Primera Health, Health Clinic Rehab, Tampa Healthcare, Allure Med, and Blue Sea Rehab have no right to receive payment for any pending bills submitted to GEICO because Primera Health, Health Clinic Rehab, Tampa Healthcare, Allure Med, and Blue Sea Rehab operated in violation of Florida law.

281.   Primera Health, Health Clinic Rehab, Tampa Healthcare, Allure Med, and Blue Sea Rehab have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO.

282.   Primera Health, Health Clinic Rehab, Tampa Healthcare, Allure Med, and Blue Sea Rehab have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all –

119

pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly received and were subjected to the Fraudulent Services.

283.   Primera Health, Health Clinic Rehab, Tampa Healthcare, Allure Med, and Blue Sea Rehab have no right to receive payment for any pending bills submitted to GEICO because – in many cases – the Fraudulent Services were never provided in the first instance.

284.   Primera Health, Health Clinic Rehab, Tampa Healthcare, Allure Med, and Blue Sea Rehab have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

285.   Accordingly, GEICO requests that this Court enter a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Primera Health, Health Clinic Rehab, Tampa Healthcare, Allure Med, and Blue Sea Rehab have no right to receive payment for any of the pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Izaguirre
### (Violation of RICO – 18 U.S.C. § 1962(c))

286.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

287.   Primera Health is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

288.   Izaguirre has knowingly conducted and/or participated in, directly or indirectly, the conduct of Primera Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years, seeking payments that Primera Health was not eligible to receive, because: (i) Primera Health unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly received and were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

289.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

290.   Primera Health's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurance

companies. The predicate acts of mail fraud are the regular way in which Izaguirre operated Primera Health, inasmuch as Primera Health was not engaged in a legitimate health care practice, and acts of mail fraud were, therefore, essential in order for Primera Health to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Primera Health continues to attempt collection on the fraudulent billing submitted through Primera Health to the present day.

291.   Primera Health is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Primera Health in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

292.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,048,000.00 pursuant to the fraudulent bills submitted through Primera Health.

293.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

## THIRD CAUSE OF ACTION
### Against Matos, Izaguirre, Carreras, and King
### (Violation of RICO – 18 U.S.C. § 1962(d))

294.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

122

295.   Primera Health is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

296.   Matos, Izaguirre, Carreras, and King were employed by, or associated with, the Primera Health enterprise.

297.   Matos, Izaguirre, Carreras, and King have knowingly agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Primera Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the used of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years, seeking payments that Primera Health was not eligible to receive under the No-Fault Law, because: (i) Primera Health unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

298.   A representative sample of the fraudulent bills and corresponding

mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

299.    Matos, Izaguirre, Carreras, and King knew of, agreed to, and acted in furtherance of the common and overall objective – i.e., to defraud GEICO and other automobile insurers of money – by submitting or facilitating the submission of the fraudulent charges to GEICO.

300.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,048,000.00 pursuant to the fraudulent bills submitted through the Primera Health enterprise.

301.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

## FOURTH CAUSE OF ACTION
### Against Matos, Primera Health, Izaguirre, Carreras, and King
### (Under Fla. Stat. §§ 501.201 et seq.)

302.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

303.    Matos, Primera Health, Izaguirre, Carreras, and King are actively engaged in trade and commerce in the State of Florida.

304.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

305. Matos, Primera Health, Izaguirre, Carreras, and King engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

306. The bills and supporting documents submitted to GEICO by Matos, Primera Health, Izaguirre, Carreras, and King in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) Primera Health's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

307. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Matos, Primera Health, Izaguirre, Carreras, and King has been materially injurious to GEICO and its Insureds.

308. The conduct of Matos, Primera Health, Izaguirre, Carreras, and King was the actual and proximate cause of the damages sustained by GEICO.

309. Matos, Primera Health, Izaguirre, Carreras, and King's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,048,000.00.

310. By reason of Matos, Primera Health, Izaguirre, Carreras, and King's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

## FIFTH CAUSE OF ACTION
### Against Matos, Primera Health, Izaguirre, Carreras, and King
### (Common Law Fraud)

311.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

312.   Matos, Primera Health, Izaguirre, Carreras, and King intentionally and knowingly made false and fraudulent statements of material fact to GEICO, and concealed material facts from GEICO, in the course of their submission of thousands of fraudulent bills through Primera Health for the Fraudulent Services.

313.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Primera Health was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, it was not in compliance with Florida law and was not eligible to collect PIP Benefits in the first instance; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and were eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

314.   Matos, Primera Health, Izaguirre, Carreras, and King made the above-described false and fraudulent statements, and also concealed material facts, in a

calculated effort to induce GEICO to pay charges submitted through Primera Health that were not reimbursable.

315.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result, has been injured in its business and property by reason of the above-described conduct, in that it has paid at least $1,048,000.00 pursuant to the fraudulent bills that were submitted by Matos, Primera Health, Izaguirre, Carreras, and King through Primera Health.

316.    Matos, Primera Health, Izaguirre, Carreras, and King's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

317.    Accordingly, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## SIXTH CAUSE OF ACTION
### Against Matos, Primera Health, Izaguirre, Carreras, and King
### (Unjust Enrichment)

318.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

319.    As set forth above, Matos, Primera Health, Izaguirre, Carreras, and King have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of GEICO.

320.    When GEICO paid the bills and charges submitted by Matos, Primera Health, Izaguirre, Carreras, and King, it reasonably believed that it was legally

obligated to make such payments based on Matos, Primera Health, Izaguirre, Carreras, and King's improper, unlawful, and unjust acts.

321.    Matos, Primera Health, Izaguirre, Carreras, and King have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Matos, Primera Health, Izaguirre, Carreras, and King voluntarily accepted, notwithstanding their improper, unlawful, and unjust billing scheme.

322.    Matos, Primera Health, Izaguirre, Carreras, and King's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

323.    By reason of the above, Matos, Primera Health, Izaguirre, Carreras, and King have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,048,000.00.

## SEVENTH CAUSE OF ACTION
### Against Sosa
### (Violation of RICO – 18 U.S.C. § 1962(c))

324.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

325.    Health Clinic Rehab is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

326.    Sosa has knowingly conducted and/or participated in, directly or indirectly, the conduct of Health Clinic Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands

of fraudulent charges on a continuous basis for over three years, seeking payments that Health Clinic Rehab was not eligible to receive, because: (i) Health Clinic Rehab operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly received and were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

327.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

328.    Health Clinic Rehab's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurance companies. The predicate acts of mail fraud are the regular way in which Sosa operated Health Clinic Rehab, inasmuch as Health Clinic Rehab was not engaged in a legitimate health care practice, and acts of mail fraud were, therefore, essential in order for Health Clinic Rehab to function. Furthermore, the intricate planning

required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Health Clinic Rehab continues to attempt collection on the fraudulent billing submitted through Health Clinic Rehab to the present day.

329.    Health Clinic Rehab is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Health Clinic Rehab in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

330.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $719,000.00 pursuant to the fraudulent bills submitted through Health Clinic Rehab.

331.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

**EIGHTH CAUSE OF ACTION**
**Against Matos and Sosa**
**(Violation of RICO – 18 U.S.C. § 1962(d))**

332.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

333.    Health Clinic Rehab is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

334.    Matos and Sosa are employed by, or associated with, the Health Clinic

Rehab enterprise.

335. Matos and Sosa have knowingly agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Health Clinic Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over three years, seeking payments that Health Clinic Rehab was not eligible to receive under the No-Fault Law, because: (i) Health Clinic Rehab unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

336. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail

fraud scheme.

337.    Matos and Sosa knew of, agreed to, and acted in furtherance of the

common and overall objective – i.e., to defraud GEICO and other automobile insurers

of money – by submitting or facilitating the submission of the fraudulent charges to

GEICO.

338.    GEICO has been injured in its business and property by reason of the

above-described conduct in that it has paid at least $719,000.00 pursuant to the

fraudulent bills submitted through the Health Clinic Rehab enterprise.

339.    By reason of its injury, GEICO is entitled to treble damages, costs, and

reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with

such other and further relief as this Court deems just, proper, and equitable.

## NINTH CAUSE OF ACTION
### Against Matos, Health Clinic Rehab, and Sosa
### (Under Fla. Stat. §§ 501.201 et seq.)

340.    GEICO incorporates, as though fully set forth herein, each and every

allegation in paragraphs 1-277, above.

341.    Matos, Health Clinic Rehab, and Sosa are actively engaged in trade and

commerce in the State of Florida.

342.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. §

501.203.

343.    Matos, Health Clinic Rehab, and Sosa engaged in unfair, deceptive, and

unconscionable acts or trade practices in their trade or commerce in the pursuit and

execution of their scheme to illegally obtain PIP Benefits from GEICO.

344.   The bills and supporting documents submitted to GEICO by Matos, Health Clinic Rehab, and Sosa in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) Health Clinic Rehab's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

345.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Matos, Health Clinic Rehab, and Sosa has been materially injurious to GEICO and its Insureds.

346.   The conduct of Matos, Health Clinic Rehab, and Sosa was the actual and proximate cause of the damages sustained by GEICO.

347.   Matos, Health Clinic Rehab, and Sosa's unfair and deceptive acts have caused GEICO to sustain damages of at least $719,000.00.

348.   By reason of Matos, Health Clinic Rehab, and Sosa's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

## TENTH CAUSE OF ACTION
### Against Matos, Health Clinic Rehab, and Sosa
### (Common Law Fraud)

349.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

350.   Matos, Health Clinic Rehab, and Sosa intentionally and knowingly made

false and fraudulent statements of material fact to GEICO, and concealed material facts from GEICO, in the course of their submission of thousands of fraudulent bills through Health Clinic Rehab for the Fraudulent Services.

351.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Health Clinic Rehab was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, it was not in compliance with Florida law and was not eligible to collect PIP Benefits in the first instance; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and were eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

352.   Matos, Health Clinic Rehab, and Sosa made the above-described false and fraudulent statements, and also concealed material facts, in a calculated effort to induce GEICO to pay charges submitted through Health Clinic Rehab that were not reimbursable.

353.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result, has been injured in its business and property by reason of the above-described conduct, in that it has paid at

least $719,000.00 pursuant to the fraudulent bills that were submitted by Matos, Health Clinic Rehab, and Sosa through Health Clinic Rehab.

354.    Matos, Health Clinic Rehab, and Sosa's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages,

355.    Accordingly, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

### ELEVENTH CAUSE OF ACTION
### Against Matos, Health Clinic Rehab, and Sosa
### (Unjust Enrichment)

356.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

357.    As set forth above, Matos, Health Clinic Rehab, and Sosa have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of GEICO.

358.    When GEICO paid the bills and charges submitted by Matos, Health Clinic Rehab, and Sosa, it reasonably believed that it was legally obligated to make such payments based on Matos, Health Clinic Rehab, and Sosa's improper, unlawful, and unjust acts.

359.    Matos, Health Clinic Rehab, and Sosa have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Matos, Health Clinic Rehab, and Sosa voluntarily accepted, notwithstanding their improper, unlawful, and unjust billing scheme.

360.    Matos, Health Clinic Rehab, and Sosa's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

361.    By reason of the above, Matos, Health Clinic Rehab, and Sosa have been unjustly enriched in an amount to be determined at trial, but in no event less than $719,000.00.

**TWELFTH CAUSE OF ACTION**
**Against Gonzalez-Torres and Garcia de Jesus**
**(Violation of RICO – 18 U.S.C. § 1962(c))**

362.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

363.    Tampa Healthcare is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

364.    Gonzalez-Torres and Garcia de Jesus have knowingly conducted and/or participated in, directly or indirectly, the conduct of Tampa Healthcare's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over three years, seeking payments that Tampa Healthcare was not eligible to receive, because: (i) Tampa Healthcare unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants,

rather than to provide medically necessary treatment to the Insureds who purportedly received and were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

365. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

366. Tampa Healthcare's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurance companies. The predicate acts of mail fraud are the regular way in which Gonzalez-Torres and Garcia de Jesus operated Tampa Healthcare, inasmuch as Tampa Healthcare was not engaged in a legitimate health care practice, and acts of mail fraud were, therefore, essential in order for Tampa Healthcare to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Tampa Healthcare continues to attempt collection on the fraudulent billing submitted through Tampa Healthcare to the present day.

367. Tampa Healthcare is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO

and other insurers. These inherently unlawful acts are taken by Tampa Healthcare in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

368.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $391,000.00 pursuant to the fraudulent bills submitted through Tampa Healthcare.

369.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

## THIRTEENTH CAUSE OF ACTION
### Against Matos, Gonzalez-Torres, and Garcia de Jesus
### (Violation of RICO – 18 U.S.C. § 1962(d))

370.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

371.    Tampa Healthcare is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

372.    Matos, Gonzalez-Torres, and Garcia de Jesus are employed by, or associated with, the Tampa Healthcare enterprise.

373.    Matos, Gonzalez-Torres, and Garcia de Jesus have knowingly agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Tampa Healthcare's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent

charges on a continuous basis for over three years, seeking payments that Tampa Healthcare was not eligible to receive under the No-Fault Law, because: (i) Tampa Healthcare unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

374.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

375.   Matos, Gonzalez-Torres, and Garcia de Jesus knew of, agreed to, and acted in furtherance of the common and overall objective – i.e., to defraud GEICO and other automobile insurers of money – by submitting or facilitating the submission of the fraudulent charges to GEICO.

376.   GEICO has been injured in its business and property by reason of the

above-described conduct in that it has paid at least $391,000.00 pursuant to the fraudulent bills submitted through the Tampa Healthcare enterprise.

377.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

**FOURTEENTH CAUSE OF ACTION**
**Against Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus**
**(Under Fla. Stat. §§ 501.201 et seq.)**

378.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

379.   Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus are actively engaged in trade and commerce in the State of Florida.

380.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

381.   Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

382.   The bills and supporting documents submitted to GEICO by Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) Tampa Healthcare's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the

Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

383.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus has been materially injurious to GEICO and its Insureds.

384.    The conduct of Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus was the actual and proximate cause of the damages sustained by GEICO.

385.    Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus's unfair and deceptive acts have caused GEICO to sustain damages of at least $391,000.00.

386.    By reason of Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

## FIFTEENTH CAUSE OF ACTION
### Against Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus
### (Common Law Fraud)

387.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

388.    Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus intentionally and knowingly made false and fraudulent statements of material fact to GEICO, and concealed material facts from GEICO, in the course of their submission of thousands of fraudulent bills through Tampa Healthcare for the Fraudulent

141

Services.

389.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Tampa Healthcare was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, it was not in compliance with Florida law and was not eligible to collect PIP Benefits in the first instance; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and were eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

390.    Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus made the above-described false and fraudulent statements, and also concealed material facts, in a calculated effort to induce GEICO to pay charges submitted through Tampa Healthcare that were not reimbursable.

391.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result, has been injured in its business and property by reason of the above-described conduct, in that it has paid at least $391,000.00 pursuant to the fraudulent bills that were submitted by Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus through Tampa

Healthcare.

392.    Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

393.    Accordingly, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

**SIXTEENTH CAUSE OF ACTION**
**Against Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus**
**(Unjust Enrichment)**

394.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

395.    As set forth above, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of GEICO.

396.    When GEICO paid the bills and charges submitted by Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus, it reasonably believed that it was legally obligated to make such payments based on Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus's improper, unlawful, and unjust acts.

397.    Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus voluntarily accepted, notwithstanding their improper, unlawful, and unjust billing scheme.

398.   Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

399.   By reason of the above, Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus have been unjustly enriched in an amount to be determined at trial, but in no event less than $391,000.00.

## SEVENTEENTH CAUSE OF ACTION
### Against Valdez
### (Violation of RICO – 18 U.S.C. § 1962(c))

400.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

401.   Allure Med is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

402.   Valdez has knowingly conducted and/or participated in, directly or indirectly, the conduct of Allure Med's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over two years, seeking payments that Allure Med was not eligible to receive, because: (i) Allure Med unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed solely to

financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly received and were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

403.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

404.   Allure Med's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurance companies. The predicate acts of mail fraud are the regular way in which Valdez operated Allure Med, inasmuch as Allure Med was not engaged in a legitimate health care practice, and acts of mail fraud were, therefore, essential in order for Allure Med to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Allure Med continues to attempt collection on the fraudulent billing submitted through Allure Med to the present day.

405.   Allure Med is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Allure Med in pursuit

of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

406. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $124,000.00 pursuant to the fraudulent bills submitted through Allure Med.

407. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

### EIGHTEENTH CAUSE OF ACTION
### Against Matos and Valdez
### (Violation of RICO – 18 U.S.C. § 1962(d))

408. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

409. Allure Med is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

410. Matos and Valdez are employed by, or associated with, the Allure Med enterprise.

411. Matos and Valdez have knowingly agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Allure Med's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over two years, seeking payments that Allure Med was not eligible to receive under the No-

146

Fault Law, because: (i) Allure Med unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

412.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

413.    Matos and Valdez knew of, agreed to, and acted in furtherance of the common and overall objective – i.e., to defraud GEICO and other automobile insurers of money – by submitting or facilitating the submission of the fraudulent charges to GEICO.

414.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $124,000.00 pursuant to the

fraudulent bills submitted through the Allure Med enterprise.

415.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

## NINETEENTH CAUSE OF ACTION
### Against Matos, Allure Med, and Valdez
### (Under Fla. Stat. §§ 501.201 et seq.)

416.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

417.    Matos, Allure Med, and Valdez are actively engaged in trade and commerce in the State of Florida.

418.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

419.    Matos, Allure Med, and Valdez engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

420.    The bills and supporting documents submitted to GEICO by Matos, Allure Med, and Valdez in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) Allure Med's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

421.    Such acts and practices offend public policy and are immoral, unethical,

oppressive, and unscrupulous. Additionally, the conduct of Matos, Allure Med, and Valdez has been materially injurious to GEICO and its Insureds.

422.    The conduct of Matos, Allure Med, and Valdez was the actual and proximate cause of the damages sustained by GEICO.

423.    Matos, Allure Med, and Valdez's unfair and deceptive acts have caused GEICO to sustain damages of at least $124,000.00.

424.    By reason of Matos, Allure Med, and Valdez's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

### TWENTIETH CAUSE OF ACTION
### Against Matos, Allure Med, and Valdez
### (Common Law Fraud)

425.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

426.    Matos, Allure Med, and Valdez intentionally and knowingly made false and fraudulent statements of material fact to GEICO, and concealed material facts from GEICO, in the course of their submission of thousands of fraudulent bills through Allure Med for the Fraudulent Services.

427.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Allure Med was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, it was not in compliance with Florida law and was not eligible to collect PIP Benefits in the first instance; (ii) in every claim, the representation that

149

the Fraudulent Services were lawfully provided and were eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

428.   Matos, Allure Med, and Valdez made the above-described false and fraudulent statements, and also concealed material facts, in a calculated effort to induce GEICO to pay charges submitted through Allure Med that were not reimbursable.

429.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result, has been injured in its business and property by reason of the above-described conduct, in that it has paid at least $124,000.00 pursuant to the fraudulent bills that were submitted by Matos, Allure Med, and Valdez through Allure Med.

430.   Matos, Allure Med, and Valdez's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

431.   Accordingly, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## TWENTY-FIRST CAUSE OF ACTION
### Against Matos, Allure Med, and Valdez
### (Unjust Enrichment)

432.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

433.   As set forth above, Matos, Allure Med, and Valdez have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of GEICO.

434.   When GEICO paid the bills and charges submitted by Matos, Allure Med, and Valdez, it reasonably believed that it was legally obligated to make such payments based on Matos, Allure Med, and Valdez's improper, unlawful, and unjust acts.

435.   Matos, Allure Med, and Valdez have been unjustly enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Matos, Allure Med, and Valdez voluntarily accepted, notwithstanding their improper, unlawful, and unjust billing scheme.

436.   Matos, Allure Med, and Valdez's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

437.   By reason of the above, Matos, Allure Med, and Valdez have been unjustly enriched in an amount to be determined at trial, but in no event less than $124,000.00.

## TWENTY-SECOND CAUSE OF ACTION
### Against Machin
### (Violation of RICO – 18 U.S.C. § 1962(c))

438.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

439.    Blue Sea Rehab is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

440.    Machin has knowingly conducted and/or participated in, directly or indirectly, the conduct of Blue Sea Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over two years, seeking payments that Blue Sea Rehab was not eligible to receive, because: (i) Blue Sea Rehab unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly received and were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

441.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

442.   Blue Sea Rehab's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurance companies. The predicate acts of mail fraud are the regular way in which Machin operated Blue Sea Rehab, inasmuch as Blue Sea Rehab was not engaged in a legitimate health care practice, and acts of mail fraud were, therefore, essential in order for Blue Sea Rehab to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Blue Sea Rehab continues to attempt collection on the fraudulent billing submitted through Blue Sea Rehab to the present day.

443.   Blue Sea Rehab is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Blue Sea Rehab in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

444.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $609,000.00 pursuant to the fraudulent bills submitted through Blue Sea Rehab.

445.   By reason of its injury, GEICO is entitled to treble damages, costs, and

153

reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

## TWENTY-THIRD CAUSE OF ACTION
### Against Matos and Machin
### (Violation of RICO – 18 U.S.C. § 1962(d))

446.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

447.    Blue Sea Rehab is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

448.    Matos and Machin are employed by, or associated with, the Blue Sea Rehab enterprise.

449.    Matos and Machin have knowingly agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Blue Sea Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over two years, seeking payments that Blue Sea Rehab was not eligible to receive under the No-Fault Law, because: (i) Blue Sea Rehab unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that the Fraudulent Services were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds

who purportedly were subjected to the Fraudulent Services; (iv) in many cases, the
Fraudulent Services were never provided in the first instance; and (v) the billing codes
used for the underlying Fraudulent Services misrepresented and exaggerated the level
of services that purportedly were provided in order to inflate the charges submitted to
GEICO.

450.    A representative sample of the fraudulent bills and corresponding
mailings submitted to GEICO that comprise, in part, the pattern of racketeering
activity identified through the date of this Complaint are described, in part, in the chart
annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail
fraud scheme.

451.    Matos and Machin knew of, agreed to, and acted in furtherance of the
common and overall objective – i.e., to defraud GEICO and other automobile insurers
of money – by submitting or facilitating the submission of the fraudulent charges to
GEICO.

452.    GEICO has been injured in its business and property by reason of the
above-described conduct in that it has paid at least $609,000.00 pursuant to the
fraudulent bills submitted through the Blue Sea Rehab enterprise.

453.    By reason of its injury, GEICO is entitled to treble damages, costs, and
reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with
such other and further relief as this Court deems just, proper, and equitable.

## TWENTY-FOURTH CAUSE OF ACTION
### Against Matos, Blue Sea Rehab, and Machin
### (Under Fla. Stat. § 501.201 et seq.)

454.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

455.    Matos, Blue Sea Rehab, and Machin are actively engaged in trade and commerce in the State of Florida.

456.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

457.    Matos, Blue Sea Rehab, and Machin engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

458.    The bills and supporting documents submitted to GEICO by Matos, Blue Sea Rehab, and Machin in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) Blue Sea Rehab's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

459.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Matos, Blue Sea Rehab, and Machin has been materially injurious to GEICO and its Insureds.

460.    The conduct of Matos, Blue Sea Rehab, and Machin was the actual and proximate cause of the damages sustained by GEICO.

461.  Matos, Blue Sea Rehab, and Machin's unfair and deceptive acts have caused GEICO to sustain damages of at least $609,000.00.

462.  By reason of Matos, Blue Sea Rehab, and Machin's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

## TWENTY-FIFTH CAUSE OF ACTION
### Against Matos, Blue Sea Rehab, and Machin
### (Common Law Fraud)

463.  GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

464.  Matos, Blue Sea Rehab, and Machin intentionally and knowingly made false and fraudulent statements of material fact to GEICO, and concealed material facts from GEICO, in the course of their submission of thousands of fraudulent bills through Blue Sea Rehab for the Fraudulent Services.

465.  The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Blue Sea Rehab was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, it was not in compliance with Florida law and was not eligible to collect PIP Benefits in the first instance; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and were eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent

157

Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

466.   Matos, Blue Sea Rehab, and Machin made the above-described false and fraudulent statements, and also concealed material facts, in a calculated effort to induce GEICO to pay charges submitted through Blue Sea Rehab that were not reimbursable.

467.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result, has been injured in its business and property by reason of the above-described conduct, in that it has paid at least $609,000.00 pursuant to the fraudulent bills that were submitted by Matos, Blue Sea Rehab, and Machin through Blue Sea Rehab.

468.   Matos, Blue Sea Rehab, and Machin's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

469.   Accordingly, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

### TWENTY-SIXTH CAUSE OF ACTION
**Against Matos, Blue Sea Rehab, and Machin**
**(Unjust Enrichment)**

470.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-277, above.

471.   As set forth above, Matos, Blue Sea Rehab, and Machin have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of GEICO.

472.   When GEICO paid the bills and charges submitted by Matos, Blue Sea Rehab, and Machin, it reasonably believed that it was legally obligated to make such payments based on Matos, Blue Sea Rehab, and Machin's improper, unlawful, and unjust acts.

473.   Matos, Blue Sea Rehab, and Machin have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Matos, Blue Sea Rehab, and Machin voluntarily accepted, notwithstanding their improper, unlawful, and unjust billing scheme.

474.   Matos, Blue Sea Rehab, and Machin's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

475.   By reason of the above, Matos, Blue Sea Rehab, and Machin have been unjustly enriched in an amount to be determined at trial, but in no event less than $609,000.00.

## JURY DEMAND

476.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.   On the First Cause of Action against Primera Health, Health Clinic

Rehab, Tampa Healthcare, Allure Med, and Blue Sea Rehab, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Primera Health, Health Clinic Rehab, Tampa Healthcare, Allure Med, and Blue Sea Rehab have no right to receive payment for any pending bills submitted to GEICO.

B.    On the Second Cause of Action against Izaguirre, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,048,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

C.    On the Third Cause of Action against Matos, Izaguirre, Carreras, and King, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,048,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

D.    On the Fourth Cause of Action against Matos, Primera Health, Izaguirre, Carreras, and King, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,048,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

E.    On the Fifth Cause of Action against Matos, Primera Health, Izaguirre, Carreras, and King, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,048,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just,

proper, and equitable.

F.      On the Sixth Cause of Action against Matos, Primera Health, Izaguirre, Carreras, and King, more than $1,048,000.00 in compensatory damages in favor of GEICO, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

G.      On the Seventh Cause of Action against Sosa, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $719,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

H.      On the Eighth Cause of Action against Matos and Sosa, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $719,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

I.      On the Ninth Cause of Action against Matos, Health Clinic Rehab, and Sosa, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $719,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

J.      On the Tenth Cause of Action against Matos, Health Clinic Rehab, and Sosa, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $719,000.00, together with punitive damages, costs, and interest,

along with such other and further relief as this Court deems just, proper, and equitable.

K.      On the Eleventh Cause of Action against Matos, Health Clinic Rehab, and Sosa, more than $719,000.00 in compensatory damages in favor of GEICO, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

L.      On the Twelfth Cause of Action against Gonzalez-Torres and Garcia de Jesus, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $391,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

M.      On the Thirteenth Cause of Action Matos, Gonzalez-Torres, and Garcia de Jesus, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $391,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

N.      On the Fourteenth Cause of Action against Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $391,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

O.      On the Fifteenth Cause of Action against Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $391,000.00, together with punitive

damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

P.      On the Sixteenth Cause of Action against Matos, Tampa Healthcare, Gonzalez-Torres, and Garcia de Jesus, more than $391,000.00 in compensatory damages in favor of GEICO, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

Q.      On the Seventeenth Cause of Action against Valdez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $124,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

R.      On the Eighteenth Cause of Action against Matos and Valdez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $124,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

S.      On the Nineteenth Cause of Action against Matos, Allure Med, and Valdez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $124,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

T.      On the Twentieth Cause of Action against Matos, Allure Med, and Valdez, compensatory damages in favor of GEICO in an amount to be determined at

trial but in excess of $124,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

U.    On the Twenty-First Cause of Action against Matos, Allure Med, and Valdez, more than $124,000.00 in compensatory damages in favor of GEICO, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

V.    On the Twenty-Second Cause of Action against Machin, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $609,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

W.    On the Twenty-Third Cause of Action against Matos and Machin, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $609,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

X.    On the Twenty-Fourth Cause of Action against Matos, Blue Sea Rehab, and Machin, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $609,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

Y.    On the Twenty-Fifth Cause of Action against Matos, Blue Sea Rehab, and Machin, compensatory damages in favor of GEICO in an amount to be

determined at trial but in excess of $609,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

Z.    On the Twenty-Sixth Cause of Action against Matos, Blue Sea Rehab, and Machin, more than $609,000.00 in compensatory damages in favor of GEICO, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

Dated:    Jacksonville, Florida
          February 27, 2026

                              */s/ Max Gershenoff*
                              Max Gershenoff (FBN 1038855)
                              John P. Marino (FBN 814539)
                              Lindsey R. Trowell (FBN 678783)
                              Kristen Wenger (FBN 92136)
                              RIVKIN RADLER LLP
                              926 RXR Plaza
                              Uniondale, New York 11556
                              Phone: (516) 357-3000

                              -and-

                              1301 Riverplace Blvd., 10th Floor
                              Jacksonville, Florida 32207
                              Phone: (904) 792-8925
                              Max.Gershenoff@rivkin.com
                              John.Marino@rivkin.com
                              Lindsey.Trowell@rivkin.com
                              Kristen.Wenger@rivkin.com

                              *Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co.*